CONTINENTAL TRAINING SERVICES, INC. d/b/a Superior Training Services, Plaintiff,

v.

Lauro CAVAZOS, Secretary of Education, United States Department of Education; Kenneth D. Whitehead, Acting Assistant Secretary of Education, United States Department of Education;

and

United States Department of Education, Defendants.

No. IP 89–129–C.

United States District Court, S.D. Indiana, Indianapolis Division.

April 10, 1989.

Herbert J. Miller, Jr., Martin D. Minsker, Randall J. Turk, Miller, Cassidy, Larroca and Lewin, Washington, D.C., Don A. Tabbert, Tabbert & Ford, Indianapolis, Ind., for plaintiff.

Michael F. Hertz, Stephen D. Altman, Marie Therese Connolly, Linda M. Anderson, Civ. Div., U.S. Dept. of Justice, Washington, D.C., Charles Goodloe, Jr., Asst. U.S. Atty., Indianapolis, Ind., for defendants.

BARKER, District Judge.

## I. *Background*

Although the history leading up to this case is both lengthy and convoluted, there is little, if any, dispute about the facts that are directly relevant to the issues presently before the court. The plaintiff, Continental Training Services, Inc. d/b/a Superior Training Services [hereinafter "Superior"], is a for-profit corporation with its principal place of business located in Indianapolis, Indiana. Since 1973, Superior has offered correspondence and residential training courses for tractor trailer (truck) driving and, since 1977, has offered similar training courses for heavy equipment operation.

From 1973 to 1980 Superior operated without being eligible to receive federal student financial assistance under the Higher Education Act (HEA), 20 U.S.C. § 1070a *et seq.* In 1980, however, the United States Department of Education [hereinafter "ED"] deemed Superior eligible to participate in the Guaranteed Student Loan (GSL) program, a program under which money is loaned to students by private lenders, with the United States paying a portion of the interest and guaranteeing repayment of the loan should the student default. *See* Title IV–B of the HEA, 20 U.S.C. §§ 1071–1087–2. In 1983 Superior was also deemed eligible to participate in the Pell Grant program, under which government funds are paid directly to students in order to assist them in meeting tuition and other expenses of education at eligible institutions.[1] *See* Title IV–A–1 of the HEA, 20 U.S.C. § 1070a–6.

In order to qualify for participation in the GSL and Pell Grant programs, Superior had to fulfill a number of regulatory requirements, including mandates that its courses be of certain lengths. More specifically, in order to be eligible for the GSL program an institution's courses must require at least 300 "clock hours" of instruction, at least twelve hours of preparation per week over each twelve week period, and must last not less than six months. Furthermore, to qualify for participation in the Pell Grant program, a course must provide at least 600 "clock hours" of instruction, with a "clock hour" being defined for purposes of a correspondence course as "60 minutes of preparation." *See* Kenneth D. Whitehead's February 1, 1989, Decision on the Eligibility of Superior Training Services, Inc. [hereinafter "Whitehead Decision"] at 2–6 (citing regulatory authority).

In early 1987, however, having been alerted to possible course length defects affecting Superior's eligibility to participate in federal student assistance programs, the ED's Office of Inspector General (ED/OIG) began an audit of Superior which, *inter alia*, focused on the issue of course length. During a meeting on May 20, 1987, the ED/OIG auditors informed Superior's management that the length of its courses apparently did not comply with the requirements set out in the applicable statutes and regulations. Then, during their formal exit interview on December 9, 1987, the auditors informed Superior's management that they had in fact determined that Superior's courses did not comply with the regulatory course length requirements and thus were not eligible to participate in the Pell Grant program. Despite this determination, ED did not issue its draft audit report until September 1, 1988, nearly nine months after the auditors had orally described their conclusions to Superior. Only one week later, on September 8, 1988, the Department of Justice (DOJ) filed a False Claims Act complaint against Superior on behalf of ED. *See United States of America v. Continental Training Services, Inc., et al.,* Civil Action No. IP88–1050–C (S.D.Ind.1988). Apparently, portions of that complaint rested in

---

1. In that same year Superior also began participating in the Parental Loans to Undergraduate Students (PLUS) and Supplemental Loans to Students (SLS) programs, two other loan programs in which the United States ultimately guarantees the loan.

substantial part on the findings issued in the draft audit report. Despite the statutory requirements for reviewing and finalizing audit reports concerning an institution's eligibility to participate in Title IV student financial aid programs, ED decided after filing the False Claims Act complaint that it would not finalize the draft audit report on Superior's eligibility.

On September 15, 1988, officials of Superior and its counsel met with ED and DOJ personnel to discuss the continuing eligibility of Superior's programs for receipt of Title IV student financial aid. At that meeting, representatives of ED disclosed their imminent intention to end Superior's eligibility to participate in the Pell Grant and GSL programs. Superior argued that its situation was not a standard eligibility case and requested an evidentiary, on-the-record hearing. Instead, ED gave Superior until noon the following day to supply whatever written information it wanted to put forth. As a result, on September 16, 1988, Superior made a 32–page written submission regarding its eligibility. At its request, Superior was allowed to make an oral presentation to the Assistant Secretary for Postsecondary Education, Kenneth D. Whitehead, on September 20, 1988. After that presentation Superior requested, and Mr. Whitehead granted, an additional comment period. Superior then submitted to Mr. Whitehead on October 4, 1988, a 135 page letter/brief and made another oral presentation to Whitehead on October 7, 1988. Superior followed that oral presentation with a supplementary submission on October 20, 1988. Finally, on November 15, 1988, Superior made a written submission responding to some of the additional materials submitted to Mr. Whitehead by ED and DOJ. *See* Whitehead Decision at 16.

Throughout this period Superior continued formally to protest ED's refusal to provide Superior an evidentiary, on-the-record hearing before ED acted to suspend or terminate Superior's eligibility to participate in the GSL or Pell Grant programs. By letters dated September 22, 1988, however, ED reiterated its refusal to provide Superior with a formal hearing on the termination of Superior's eligibility at any time. ED's position was that "[t]here are no statutory or regulatory procedural requirements that ED must follow in deciding whether an institution satisfies the statutory and regulatory definitions of an eligible proprietary institution of higher education or an eligible vocational school." (Letter of Amy L. Schwartz and Stephen M. Kraut to Herbert J. Miller, Jr., dated September 22, 1988). In ED's view, "there is no formal procedure that must be followed before a decision is reached concerning the continuation or revocation of an institution's official eligibility designation." (Letter of Kenneth D. Whitehead to Kenneth E. Whittington, dated September 22, 1988). In other words, ED's position was that its procedural obligations to Superior were more than met by affording Superior an opportunity to make several written submissions and to attend informal oral conferences regarding ED's contemplated termination of Superior's eligibility to participate in the Pell Grant and GSL programs.

On February 1, 1989, Assistant Secretary Whitehead issued a 75–page opinion on Superior's eligibility. In that decision Mr. Whitehead concluded that Superior's truck and heavy equipment programs were not eligible to participate in ED's Pell Grant and student loan programs (GSL, PLUS, and SLS) due to inadequate course length. The decision was accompanied by a letter from Mr. Whitehead, dated February 1, 1989, putting the decision into immediate effect.

On February 6, 1989, Superior filed the complaint in this action seeking a temporary restraining order, a preliminary injunction, and a permanent injunction against further implementation of Mr. Whitehead's February 1 decision. Superior's complaint stated several grounds for its requested injunctions: first, that ED's refusal to provide it with an evidentiary, on-the-record hearing prior to suspending or terminating Superior's eligibility violated Superior's statutory and regulatory hearing rights under section 487 of the HEA (20 U.S.C. § 1094) and 34 C.F.R.

§ 668.81–668.97, *see* Complaint at Counts Two and Three; second, that ED's revocation of Superior's eligibility through procedures other than those specified in the regulations violated the Administrative Procedure Act's requirements for notice and publication of procedures, 5 U.S.C. § 552(a), *see* Complaint at Count Four; third, that ED's refusal to provide an evidentiary, on-the-record hearing violated Superior's constitutional right not to be deprived of liberty or property without due process of law, *see* Complaint at Count One; and fourth, that ED's decision terminating Superior's eligibility to participate in Title IV programs was without rational foundation, and thereby constituted arbitrary and capricious agency action in violation of the APA, 5 U.S.C. § 706(2)(A), and in violation of Superior's constitutional rights to equal protection and due process, *see* Complaint at Counts Five and Six.

On February 7, 1989, after hearing oral arguments from attorneys for both the government and Superior, the court granted Superior's request for a T.R.O.—an order which, pursuant to the stipulation of the parties, was eventually extended until March 13, 1989. Pursuant to the Second Supplementary Order of this court, issued February 14, 1989, the merits of this matter were bifurcated into two separate proceedings. The first phase of the trial was ordered limited solely to consideration of the plaintiff's procedural claims that it was denied adequate process by ED (Counts One through Four of the complaint). Consideration of the plaintiff's secondary claims that ED's eligibility decision was substantively "arbitrary and capricious," if such consideration proved necessary, was deferred to a later phase of the trial in this matter. In light of the parties' representations that they planned to file cross-motions for summary judgment, an accelerated briefing schedule was established and oral argument on the plaintiff's request for a preliminary injunction, the government's motion to dismiss the complaint, and the parties' cross-motions for summary judgment was scheduled for March 10, 1989. After hearing and considering those arguments, and further considering the voluminous briefs and other documents submitted in this action, the court granted Superior's request for a preliminary injunction on March 13, 1989. *See* Order of March 13, 1989. This matter is now before the court on the government's motion to dismiss and the parties' cross-motions for summary judgment.[2]

## II. *Superior's Claim That It Has Been Denied Its Statutory And Regulatory Hearing Rights*

■ Section 487 of Title IV of the HEA, codified at 20 U.S.C. § 1094 (hereinafter "§ 1094"), grants authority to the Secretary of Education to prescribe regulations for "the limitation, suspension, or termination of the eligibility for any program under this subchapter ... of any *otherwise eligible institution* ... whenever the Secretary has determined, *after* reasonable notice and opportunity for *hearing on the record*, that such institution has violated or failed to carry out any provision of this subchapter ..." 20 U.S.C. § 1094(c)(1)(D) (emphasis added). The regulations thus promulgated presently appear at 34 C.F.R. § 668.81–668.97 (hereinafter "Subpart G").

Superior urges that this matter falls squarely within the scope of section 1094:

Indeed, Rule 62(c) specifically provides that the district court may 'suspend, modify, restore, or grant an injunction during the pendency of the appeal.' Accordingly, the district court retains jurisdiction to enforce its prior order and the case may proceed to a trial on the merits. The only restriction on the trial court's power occurs if the appellate court enters an order staying the lower court until the appeal has been completed." 11 C. Wright & A. Miller, *Federal Practice and Procedure* § 2962 (1973 & Supp.1988) (footnotes omitted). The Seventh Circuit has issued no such stay in this case.

---

**2.** On March 30, 1989, ED filed a notice of appeal of this court's March 13, 1989, Order granting the plaintiff's motion for a preliminary injunction. Such an appeal does not preclude this court in any way from proceeding to the merits of the parties' claims: "An appeal from the grant or denial of a preliminary injunction does not divest the trial court of jurisdiction or prevent it from taking other steps in the litigation while the appeal is pending. According to Rule 62(a) [of the Federal Rules of Civil Procedure] there is no automatic stay of the judgment in an injunction suit pending on interlocutory appeal.

that is, that ED's action with regard to Superior was obviously a "termination" or a "suspension." Therefore, concludes Superior, because ED readily concedes that it did not follow the regulations set out in Subpart G, Superior is entitled to summary judgment on its statutory and regulatory claims.

ED argues, however, that although the HEA provides for hearings under some circumstances, it does not provide for hearings on "eligibility" determinations. ED focuses the court's attention on the fact that section 1094 only requires a hearing on the record for the limitation, suspension, or termination of eligibility for an *"otherwise* eligible institution." ED points out that the Secretary has narrowly interpreted this "otherwise eligible institution" language such that it means an institution that has *already* met the preconditions for participating in the Title IV, HEA programs. *See* Defendant's Brief in Opposition to Plaintiff's Motion for Preliminary Injunction and in Support of Defendants' Motion to Dismiss, or in the Alternative, for Summary Judgment [hereinafter "Defendants' Brief"] at 12. Those "preconditions" include requirements that the educational institution satisfy the statutory and regulatory definitions of the terms "vocational school" or of "proprietary institution of higher learning," and that the institution be administratively "capable" and "financially responsible." *See, e.g.,* 34 C.F.R. §§ 668.13 and 668.14. ED points out that the Secretary has traditionally treated questions of adequate course length as a subquestion of this "precondition" analysis. That is, if ED determines that an institution fails to satisfy the *threshold* requirement of being an eligible "vocational school" or an eligible "proprietary institution of higher education,"[3] it is not an "otherwise eligible institution" and, therefore, does not fall within the scope of sec-

tion 1094(c)(1)(D). Furthermore, urges ED, an "agency's interpretations in legislative regulations of a statute it is charged with administering" are entitled to "great deference." *See* Defendants' Brief at 10–11 (citing authority). "The issue," concludes ED, "is whether ED's regulatory interpretations of section 1094(c)(1)(D) are reasonable"—and, if reasonable, ED urges that those regulatory interpretations must be viewed as controlling. *Id.* at 11.

■ The fundamental flaw in ED's argument, however, is that it does not go far enough. In reviewing an agency's interpretation of a congressional statute, the Seventh Circuit has effectively required a tripartite analysis: (1) do the agency's regulations reasonably interpret the language of the statute?; (2) did the agency act in conformance with those reasonable regulations?; and (3) do those facially reasonable regulations *as applied to the facts of this particular case* violate the governing statute? *See, e.g., City of West Chicago, Illinois v. United States Nuclear Regulatory Comm'n,* 701 F.2d 632, 641 (7th Cir.1983) (declaring that a court's "inquiry cannot end with a finding that the [agency] acted in conformance with its own regulations, for we must determine whether those regulations *as interpreted* violate the governing statute. If the [Act] requires a formal hearing ... then the [agency] must provide one, despite its interpretation of the regulations") (emphasis added). Although ED argues vigorously and voluminously that its actions fulfill the first two of these requirements, it completely ignores consideration of the third requirement: that a facially reasonable regulation must also be reasonable "as interpreted."

The court is willing to assume, for the sake of argument, that ED is correct when it asserts that, on its face, Subpart G is a reasonably narrow interpretation of the

---

**3.** The court notes that the defendant does not state *how* ED "determines" that an institution is not "otherwise eligible" and thus is outside of the procedural requirements of the regulations —and, of course, the court must reject as unper-

suasive legerdemain ED's assertion that *because* Superior is ineligible it is not entitled to process: the very question before the court in this matter is what degree of process must be afforded

statutory language of section 1094.[4] The court will also assume that, in this case, ED acted in conformance with the requirements of its own regulations. For ED, these two assumptions are enough to entitle it to summary judgment in its favor. Yet, one further step must be taken: given these two assumptions, the issue before the court then becomes whether Subpart G *as interpreted* in this particular case is a reasonable reading of section 1094.[5]

When Congress enacted section 1094(c), it was obviously attempting to provide certain procedural protections for the settled expectations [6] of those institutions that had been deemed eligible to participate in Title IV programs. That is, Congress determined that an institution's interest in being deemed "eligible" was substantial enough that that status ought not be alterable by the government without a "hearing on the record."

For over eight years Superior has been deemed eligible by ED to receive Title IV funds and, reasonably enough, Superior has relied on its status as an eligible institution in making certain business decisions. Superior has shown that, as a result of this reliance, revocation of its eligibility now would cause it serious and irreparable harm. According to ED, however, Superior's status as an eligible institution is entitled to no statutory procedural protection whatsoever: because Superior was never

"really" eligible to receive Title IV funds (that is, because Superior's courses were never *actually* 300 or 600 clock hours long, even though ED thought they were), ED urges that this is not a case of eligibility "termination" at all. That is, ED's argument is that because Superior was *never* an "otherwise eligible" institution, it never in fact had anything that could be "terminated" and, therefore, was not entitled to any type of "termination" hearing. The question before the court is whether this interpretation of the applicable regulations is "reasonable" in light of the language and congressional intent underlying section 1094(c)(1)(D). The court finds that it is not.

Although it is clearly reasonable to make certain determinations of eligibility outside of the procedural framework established in section 1094(c)(1)(D), *see, e.g., Beth Rochel Seminary v. Bennett*, 825 F.2d 478 (D.C. Cir.1987), *aff'g* 624 F.Supp. 911 (D.C.1985), as interpreted by ED in this case, the agency's regulations violate the governing statute. By arguing that this case involves an "eligibility" determination and not a "termination" decision, ED is engaging in an elaborate game of words by which it hopes to use a statutory exception to engulf (and thereby negate) the statutory rule. For eight years, Superior has been deemed eligible to receive Title IV funds. For those eight years Superior has seemed eligible; it has acted eligible; it has been treated as

Superior *before* ED makes that threshold determination of eligibility.

4. The court notes that the language of 20 U.S.C. § 1094(c)(2)(A), with its reference to procedures that must be afforded an "eligible institution" accused of engaging in a "substantial misrepresentation of the nature of its educational program," seems on its face to be more directly applicable to the facts of this case than the more generalized provisions of section 1094(c)(1)(D). However, because both parties concentrate on section 1094(c)(1)(D), because the court assumes that ED's objections to the applicability of section 1094(c)(2)(A) would be precisely the same as it is to the applicability of (c)(1)(D) (that is, that (c)(2)(A) only applies to "eligible" institutions), and because section (c)(2)(A) simply incorporates section (c)(1)(D) by reference, the court's analysis will focus on the general language of section 1094(c)(1)(D).

5. This type of judicial analysis should not be totally foreign to ED: it is precisely the ap-

proach that is taken in a constitutional challenge to a statute. In such a case, the court would make a threshold determination of whether the statute is constitutional *on its face;* secondly, the court would determine whether the statute is constitutional *as applied.* To adapt this constitutional parlance to the present situation, this court has first assumed that ED's regulations *on their face* are reasonable interpretations of section 1094; now, the question before the court is whether Ed's regulations *as applied* are reasonable interpretations of section 1094.

6. Whether these "settled expectations" rise to the level of a constitutionally protectible interest is a question the court addresses below in § III(A) of this Entry. Of course, it goes almost without saying that Congress is free to provide statutory procedural protection to interests that are not necessarily *constitutionally* protectible.

eligible; and, for all the world, Superior has *in fact* been an eligible institution. Now ED wishes to withdraw that eligibility. However, section 1094(c)(1)(D) establishes elaborate procedures for the termination of eligibility (procedures which ED understandably wishes to avoid), so ED has determined that Superior was never *really* eligible to begin with and that, therefore, no "termination" is involved in this case. With this type of logic, however, ED would never have to provide a hearing under section 1094(c)(1)(D) at all: whenever it determined that the statutory procedural requirements were going to be too cumbersome, ED could simply declare that an institution was not *actually* eligible; there being nothing left to "terminate," section 1094 would be inapplicable. Presumably, ED feels it would be entitled to make these retroactive determinations of "actual" eligibility any number of years (or even decades) after the institution had originally been deemed eligible. Yet, it is precisely this type of "retrospective fiction" that the United States Supreme Court has rejected in another context. *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, n. 5, 105 S.Ct. 1487, n. 5, 84 L.Ed.2d 494 (1985).

In *Loudermill*, the appellee had been hired as a security guard by the Cleveland Board of Education after having stated on his job application that he had never been convicted of a felony. Eleven months later, as part of a routine examination of its employment records, the Board discovered that Loudermill had in fact been convicted of grand larceny. By a letter the Board informed Loudermill that he was being dismissed from his job for his dishonesty in filling out his employment application. Loudermill was not afforded an opportunity to respond to the charge of dishonesty

and subsequently filed suit claiming that the lack of a pretermination hearing violated his constitutional right to procedural due process. As part of its defense to Loudermill's due process claim, the Board argued that Loudermill had no property right to his job under state law because he had obtained his appointment by lying on his application. It argued that, had Loudermill answered truthfully, he would not have been hired in the first place and that, therefore, he lacked a "legitimate claim of entitlement" to the position. In footnote 5 of its opinion, the Court emphatically rejected the logic of this argument:

> [T]he argument relies on a retrospective fiction inconsistent with the undisputed fact that Loudermill was hired and did hold the security guard job. The Board cannot escape its constitutional obligations by rephrasing the basis for termination as a reason why Loudermill should not have been hired in the first place.

*Id.* In the present case, Superior argues that it is entitled to be afforded the procedures set out in section 1094 and Subpart G. ED urges that these provisions are inapplicable here because they only apply to termination proceedings against an "otherwise eligible institution"—and because Superior was never *really* an "otherwise eligible institution," it does not fall within the statutory language. To paraphrase *Loudermill*, this argument is a "retrospective fiction" inconsistent with the undisputed fact that Superior *was* deemed eligible and *did* receive Title IV funds for a number of years. ED cannot escape its statutory and regulatory obligations by rephrasing the basis for Superior's termination as a reason why Superior should never have been deemed eligible in the first place.[7]

---

7. At oral argument ED insisted that this court should not look to *Loudermill* because *Loudermill* does not apply "at all to the interpretation of ... section 1094." *See* Transcript of March 10, 1984, Proceedings [hereinafter "Transcript"] at 46–47. Of course, this court is cognizant of the fact that *Loudermill* is not binding precedent in this case—and, indeed, that in footnote 5 the *Loudermill* Court was not even addressing a question of statutory interpretation. The court finds, however, that the logic of *Loudermill* is persuasively transferable from the constitution-

al context of that case to the statutory and regulatory context of this case. In its written Response, ED mounts a slightly more sophisticated attack on the court's reliance on *Loudermill*. ED urges that "The HEA ... has an express provision that ED need provide on-the-record hearings only to institutions that are *otherwise eligible.* The state statute at issue in *Loudermill* did not limit hearings to legitimately hired employees. Instead it granted a property right to continued employment to all employ-

More fundamentally, however, the court finds that ED's strained interpretation of the applicable regulations in this case violates the clear congressional purpose undergirding section 1094. The court is willing to accept as reasonable the implicit assumption underlying ED's regulations that, in enacting section 1094, Congress did not intend to provide procedural protections for initial determinations of eligibility (thus, the "otherwise eligible institution" language). It may even be reasonable to find that, when an institution has its eligibility withdrawn only a year after it was originally deemed eligible, such a withdrawal is not really a "termination," but rather is still part of the threshold "otherwise eligible institution" decision. *See, e.g., Beth Rochel Seminary v. Bennett,* 825 F.2d 478 (D.C.1987).[8] At some point, however, after having been deemed "eligible" for a certain length of time, it becomes unreasonable to label the withdrawal of that eligibility as anything other than a "limitation, suspension, or termination" within the meaning of section 1094.[9] Precisely how long this "length of time" must be before it becomes unreasonable to refuse to characterize the withdrawal of eligibility as a "termination," the court is not required to say in this case. The court merely finds that, given the admittedly unique facts of this case, over eight years of apparent eligibility is long enough. Congress clearly intended to provide procedural protections for the settled expectations of those institutions that have been deemed eligible to receive Title IV funds, and that manifest congressional intent may not be thwarted through convoluted verbal gymnastics that unreasonably attempt to label what ED did to Superior on February 1, 1989, as anything other than what it was: a *termination* of eligibility.

Thus, the court finds that Superior's status as an eligible institution was entitled to the procedural protections promulgated pursuant to section 1094. *See* Subpart G. At oral arguments ED conceded that, prior to Whitehead's decision, Superior had not been accorded the full panoply of procedural protections set out in Subpart G. Therefore, as a matter of law, the court finds that Superior is entitled to prevail on its claim that ED denied the plaintiff its statutorily guaranteed rights under 20 U.S.C. § 1094(c)(1)(D).

### III. *Superior's Claim That It Has Been Denied Its Constitutional Right To Procedural Due Process*

Having found that Superior is entitled to relief based on its section 1094 claim, the court further finds that its decision in favor of Superior need not rest solely on this statutory analysis: an analysis of Superior's constitutional claim yields precisely the same result. As with any claim that a

---

ees." Defendant's Response at 6. The court finds, however, that this argument presents a distinction without a difference. Footnote 5 of *Loudermill* would not have been altered if the state had granted a property right of continued employment only to "those employees who were legitimately hired." It would still be a "restrospective fiction" to argue that, *because* a person was not legitimately hired, she is not entitled to any procedural protections when the decision is made about whether or not she were legitimately hired. Such logical circuity is simply unpersuasive.

**8.** In addition to the vast difference in amount of time the two institutions had been deemed eligible prior to having their eligibility withdrawn, there is at least one other reason that ED's heavy reliance on *Beth Rochel* to justify its actions in this case is fundamentally misplaced: Although *Beth Rochel* finds that ED's regulations are reasonable as written (a finding that the court has assumed here), because of the

government's assertion of the "uniqueness" of both cases, *Beth Rochel's* further finding that ED's regulations were reasonable *as interpreted* in that case necessarily has almost no precedential value here. In particular, although it may have been reasonable to interpret the regulations as not requiring an on-the-record hearing when there were no facts in dispute (as in *Beth Rochel*), that does not mean the same interpretation would be reasonable when there clearly are dispositive facts in dispute (as in this case). *See id.* at 481–82.

**9.** The court, of course, is aware that the length of time a certain benefit has been accorded is irrelevant to a determination of whether a *constitutionally* protectible property right has been created. *See, e.g., Bishop v. Wood,* 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976). Congress, however, is unquestionably free to create *statutory* protections for such settled interests—as it clearly did by enacting section 1094(c)(1)(D).

constitutional right to procedural due process has been violated, the court must initially make the threshold determination of whether Superior possessed a constitutionally protectible interest that was adversely impacted by ED's actions. *See* R. Rotunda, J. Nowak, & J. Young, *Treatise on Constitutional Law* § 17.2 (1986). If—and only if—this threshold inquiry leads to a positive finding need the court proceed to a determination of precisely what process Superior was due. *See generally, Id.* at §§ 17.1–17.9. Finally, the type and amount of process that such an analysis indicates Superior was entitled to must be compared with the type and amount of process that Superior was in fact provided. For the reasons set out below the court finds that this analysis leads to the ultimate conclusion that Superior is entitled to prevail on its constitutional claim as well as on its section 1094 claim.

### A. Superior's Constitutionally Protectible Interests

■ The plaintiff urges that ED's actions deprive Superior of its constitutionally protected liberty and property interests. The plaintiff further argues that "[e]ach of these interests is independently sufficient to trigger due process protections." *See* Plaintiff's Brief in Support of Motion for a Temporary Restraining Order [hereinafter "Plaintiff's Brief in Support"] at 32. In its briefs ED copiously contests these assertions. *See, e.g.,* Defendants' Brief at 29–39. Yet, at oral argument, ED's opposition to Superior's claim of protected interests was far less vigorous.

Both sides were willing to stipulate that, under *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), there are two conditions which must be met before a court can find a constitutionally protected liberty interest: (1) financial detriment and (2) injury to reputation. *See* Plaintiff's Memorandum in Opposition at 4; Defendants' Brief at 38. Furthermore, at oral argument, counsel for ED conceded that the financial detriment potentially flowing to Superior by virtue of Mr. Whitehead's February 1, 1989, decision fulfilled

the first prong of the two-pronged *Roth* test. *See* Transcript at 31.

ED contends, however, that the Whitehead Decision in no way injures Superior's reputation. ED argues that its administrative action with respect to Superior "rests only on course length defects" and that such findings of course length defects could not "seriously damage [Superior's] standings and associations in [its] community." Defendants' Brief at 38–39 (quoting *Roth*, 408 U.S. at 573, 92 S.Ct. at 2707). Yet, at oral argument, ED's counsel conceded that this court may not ignore the climate in which Mr. Whitehead's decision was handed down. *See* Transcript at 29–30. Even if this court were willing to accept ED's questionable argument that the Whitehead Decision, standing alone, did not harm Superior's reputation, that argument would not be decisive. As ED urged at oral argument, by its very nature, a determination of "harm to reputation" cannot be rendered in some sort of vacuum. The court must take into consideration "matters outside of the decision being challenged" in order to properly gauge whether that decision "implicates" Superior's reputation. Transcript at 25. The Whitehead Decision was issued only months after the Justice Department had filed a lawsuit against Superior accusing it of having violated the False Claims Act by representing that it met the various regulatory course length requirements. Coupled with the false claims lawsuit, it is undeniable that the Whitehead Decision to terminate Superior's eligibility was seen as ED's conclusion that Superior had in fact lied and been otherwise misleading about its compliance with the course length requirements. Furthermore, the release of the Whitehead Decision was accompanied by a press release in which Superior was accused of misrepresentation, distortion, and "fraud," Plaintiff's Brief in Support at Appendix 1, and by a press conference in which Mr. Whitehead accused Superior of "misrepresentations" and of providing "less than adequate training, drawing these students into it and then not providing what they're supposed to be providing." See Plaintiff's Memorandum in Opposition at Appendix. Taken in

context, these facts clearly indicate that the Whitehead Decision injured Superior's reputation. When that fact is coupled with ED's concession that the Whitehead Decision would cause financial detriment to Superior, it is plain that that Decision adversely impacted upon Superior's constitutionally protected liberty interest.

Superior also maintains that it had a protected *property* interest in its continued eligibility to receive Title IV funds. In its brief, however, ED maintains that "Superior's property interest claims lack foundation because the benefits of the Higher Education Act (HEA) on which Superior is dependent flow to students, not to schools." Defendants' Brief at 30. In support of this "third party beneficiary" argument ED cites a number of cases, relying most heavily on *Northlake Community Hospital v. United States,* 654 F.2d 1234 (7th Cir.1981). Yet, at oral argument, ED conceded that *Northlake* actually served to defeat its argument that Superior had no protectible property interest in its continued eligibility:

> THE COURT: And so *Northlake* actually stands for the proposition that there is a protectible property interest.
>
> MS. CONNOLLY: That's correct....
>
> THE COURT: So doesn't *Northlake* actually defeat your argument with respect to the property interest being nonexistant?
>
> MS. CONNOLLY: Yes, your Honor. It doesn't defeat it entirely; it says there's a lesser type of property.
>
> THE COURT: Lesser, but protectible?
>
> MS. CONNOLLY: But existent; yes.

Transcript at 36–37. In fact, for ED's purposes, all of the cases it cites in support of its third party beneficiary argument suffer from the same flaw: they each find that, as a threshold matter, a third party beneficiary *does* have a constitutionally protectible property interest in continued receipt of governmental benefits. The cases cited by ED simply go to the weight that should be accorded that property interest, not the fact of its existence. The majority of courts has long found that the "indirect beneficiaries" of certain governmental pro-

grams have property interests in their eligibility to receive those benefits. *See, e.g., Patchogue Nursing Center v. Bowen,* 797 F.2d 1137, 1144–45 (2d Cir.1986), *cert. denied,* 479 U.S. 1030, 107 S.Ct. 873, 93 L.Ed. 2d 828 (1987); *Ram v. Heckler,* 792 F.2d 444, 447 (4th Cir.1986). Consistent with these cases and with the concessions made at oral argument by ED's counsel, the court finds that, in addition to implicating a protected liberty interest, the Whitehead Decision adversely impacted upon Superior's constitutionally protected property interest to continued eligibility.

**B. The Process Superior Was Due**

■ "Once it is determined that the Due Process Clause applies, 'the question remains what process is due.'" *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 541, 105 S.Ct. 1487, 1492–1493, 84 L.Ed.2d 494 (1985) (quoting *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972)).

> [I]dentification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976). The court turns then to this three-fold balancing test.

Superior's interests are substantial. "The more important the interest and the greater the effect of the impairment, the greater the procedural safeguards the state must provide to satisfy due process." *Haygood v. Younger,* 769 F.2d 1350, 1355–56 (9th Cir.1985) (en banc), *cert. denied sub nom. Cranke v. Haygood,* 478 U.S. 1020, 106 S.Ct. 3333, 92 L.Ed.2d 739 (1986). Evidence submitted by Superior indicates that approximately 95% of the plaintiff's stu-

dents obtain student funding through the Title IV programs administered by ED. Superior also showed that termination of the plaintiff's eligibility to participate in those programs would cause the plaintiff severe financial difficulty, almost certain to culminate in a bankruptcy that would be accompanied by harm to the plaintiff's reputation and other intangible damages. Yet, as ED points out, for at least two reasons, Superior's interest does not rise to the highest possible level—a level of interest epitomized by the welfare recipient facing potential starvation in *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). First, unlike the welfare recipient in *Goldberg*, Superior has other sources of income in addition to the terminated governmental funds.[10] *Cf. Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed. 2d 18 (1976). *Compare Ritter v. Cohen*, 797 F.2d 119, 124–25 (3d Cir.1986) (rejecting a physician's due process challenge to eligibility termination even though 99% of his practice was based on Medicaid). Second, unlike the welfare recipient in *Goldberg*, Superior is not the intended beneficiary of the governmental assistance program—and, as a "third party beneficiary," Superior's interests are entitled to less constitutional weight.[11] *See* Defendants' Brief at 30–31 & 41–42 (citing *Northlake Community Hospital v. United States*, 654 F.2d 1234 (7th Cir.1981), and other cases). Thus, Superior's interest in avoiding financial ruin is substantial, al-though less substantial than the extreme case of *Goldberg v. Kelly*.

On the other hand, the government's interests in denying Superior an on-the-record, evidentiary hearing, while weighty, are not nearly as compelling as ED would have the court believe. In its brief ED specifically identifies four interests that it urges would be adversely affected by such additional procedural requirements: 1) reserving funds for eligible institutions; 2) preserving the integrity of Title IV programs; 3) protecting the federal fisc; and 4) deterring institutional misconduct. As Superior suggests in its response, *see* Plaintiff's Memorandum in Opposition at 17, n. 7, it appears to the court that the first three of these interests are merely alternative formulations of the same interest. Furthermore, ED's assertion of a compelling interest in avoiding payments to unqualified institutions during the pendency of a hearing is undermined somewhat by the fact that, from the time that ED initially determined that Superior's advanced courses did not meet the course length requirements for eligibility under the Pell Grant program to the time that ED actually decided to remove the plaintiff's eligibility for federal funds, a substantial delay of over a year had elapsed. Moreover, there is no reason for this court to believe that provision of a formal hearing would have taken any *more* time than the 4½ or 5 months [12] required by the informal, ad hoc procedures employed by ED in this case.

---

**10.** Although the court accepts this point as a legitimate argument by ED, it must reject the expansive language used by ED when making this point in its brief. ED's brief urges that "Superior's choice to restrict its educational programs to students receiving federal assistance provides it with no greater rights than other institutions that have not grown totally dependent on federally supported students. Superior's own business practices should not confer upon it favored status as an exception." Defendants' Brief at 34. If this logic were accepted totally it would completely undermine the basis of *Goldberg:* according to ED's argument, Kelly's "choice" to restrict his income to federal assistance should provide him with no greater rights than other individuals who have not grown "totally dependent" on federal funds. *See Goldberg*, 397 U.S. at 262, 90 S.Ct. at 1017 (rejecting the constitutional significance of the ar-gument that public assistance benefits are a "privilege" and not a "right").

**11.** The court notes that there is at least a colorable argument that Superior is not a third party beneficiary at all, but is in fact a direct beneficiary under the statute. *See* Transcript at 32–35. The court finds, however, that it need not decide this issue: even giving ED the benefit of the doubt on this question, for the reasons set out below the court must ultimately find that the procedures provided to Superior by ED were constitutionally inadequate.

**12.** The draft audit report was issued on September 1, 1988, and on September 15, 1988, ED disclosed to Superior the department's imminent intention to terminate Superior's eligibility. The Whitehead Decision was issued on February 1, 1989.

Yet, to whatever minimal extent a formal hearing would have consumed more time and resources than the procedures actually provided, this court must take account of the important public interest in conserving scarce fiscal and administrative resources and of the equally important interests of those intended beneficiaries who are denied assistance because limited federal funds have been usurped by ineligible parties. *See, Mathews v. Eldridge,* 424 U.S. 319, 347–49, 96 S.Ct. 893, 908–10, 47 L.Ed.2d 18 (1976). In addition to the relative weakness of ED's first three stated interests, it is also less than obvious to the court how ED's valid interest in "deterrence" would be ill-served in any cognizable way by providing Superior a formal hearing. The court has heard no one suggest that Superior be allowed to retain its eligibility if that eligibility were illegitimately obtained; the suggestion is merely that ED be required to take certain basic steps prior to terminating that eligibility.

ED urges, however, that "[t]here is no motivation to comply with statutory standards ... if schools can gain eligibility through misrepresentations, and then retain it ... while extensive procedural hurdles including a full trial are pursued." Defendants' Brief at 45. Although this argument is understandable, it must be given minimal weight: the governmental interest in the deterrent effect of instantaneous punishment is diametrically opposed to the societal interests underlying the constitutional guarantee of due process. Thus, while it may increase "deterrence" for the government to circumvent "procedural hurdles" by effecting an immediate taking of constitutionally protected property upon the slightest intimation of wrongdoing, such deterrence must be seen as constitutionally illegitimate. Therefore, having taken account of each of the government's four proffered justifications, the court finds that ED's interest in denying Superior an on-the-record, evidentiary hearing is entitled, at best, to only moderate weight.[13]

Finally, the court finds that, given the unique facts of this case, the risk of an erroneous deprivation is unacceptable. This case does not involve "an easily documented, sharply focused decision in which issues of credibility and veracity play little role" and which turns on "routine, standard, unbiased reports by ... professionals." *Town Court Nursing Center, Inc. v. Beal,* 586 F.2d 266, 277 (3d Cir.1978), *quoted in Northlake Community Hospital v. United States,* 654 F.2d 1234, 1242 (7th Cir.1981). Rather, as ED's own auditor has conceded, this case marks ED's first ever attempt to determine actual compliance with the clock hour requirement for correspondence courses. Okura Dep. at 154–55. Indeed, at the time Superior was audited, ED had not even determined precisely how an institution's compliance with the clock hour requirement was to be measured. Thus, as the plaintiff characterizes

---

**13.** Although it failed to include the argument in its listing of governmental interests, at oral argument ED revealed what may be its true interest in not providing an on-the-record, evidentiary hearing to Superior: it fears establishing a cumbersome precedent for future cases. *See* Transcript at 68–69. ED makes approximately 250 eligibility decisions a month, mostly in a very summary fashion. *See* Defendants' Brief at 5. Requiring that each of the decisions be made only after an on-the-record, evidentiary hearing would obviously result in an enormous burden to ED. Those routine decisions, however, are unquestionably distinguishable from the present case. The vast majority are initial eligibility determinations, not revocations of the sort at issue here. *Id.* Moreover, of the relatively small number of ED's eligibility determinations that are in fact revocations, "the vast majority" involve no disputed issues of fact—quite unlike the case at bar. *See* Whitehead Declaration at 3. Indeed, at oral argument, counsel for ED readily acknowledged that this is a "unique" case. Transcript at 3. Thus, the precedential value of providing a hearing to Superior would be minimal. Of course, the court is aware that even a "unique" precedent could be used by enterprising litigators to bolster demands for formal hearings in future cases, *see* Transcript at 68–70, but ED's interest in not providing such litigators a precedent (a precedent that ED concedes would in any event be clearly distinguishable) is entitled to minimal weight. Furthermore, the court cannot help noting that if ED had *voluntarily* provided Superior a formal hearing, that decision would more than likely have been accorded even less precedential value than a similar decision by this court.

it, the decision on Superior's eligibility "was one fraught with difficult and unfamiliar empirical and methodological questions as well as with legal uncertainties." Plaintiff's Memorandum in Opposition at 22–23.

Furthermore, this fact-sensitive and potentially complex decision was made by the same officials at ED who had worked intimately with the Department of Justice to help bring about the False Claims Act indictment of Superior. The decision on eligibility was made only months after the False Claims Act was filed and, although the issues involved in the false claims case and in the administrative decision on eligibility are not precisely identical, at the very least the prosecution of the false claims case would have been complicated by an administrative determination that Superior was in fact "eligible." Additionally, during the period that the eligibility decision was being made, there apparently occurred a number of *ex parte* contacts between the decision makers and DOJ officials. The court need not make the extraordinary finding of bias on the part of Mr. Whitehead and ED in order to recognize that, given the atmosphere in which the eligibility decision was made and further given the informal process leading up to that decision, the risk of an erroneous deprivation was unacceptably high.

This recognition is bolstered by the fact that that risk could simply and effectively have been reduced by implementing additional procedural safeguards. ED urges that any *ex parte* contacts between DOJ officials and the ED decision makers were entirely appropriate. Yet, this court could be far more certain of that fact if all contacts between the parties and the decision makers had been limited to on-the-record, adversarial proceedings. ED asserts that there was no pressure on ED to make a finding on eligibility that would be consistent with the decision to indict Superior under the False Claims Act. Yet, all question of explicit or implicit pressure could have been eliminated if the eligibility decision had been made by an independent administrative law judge, rather than by the same ED officials who had worked to bring

about the False Claims Act indictment in the first place. Thus, the court finds that the risk of an erroneous deprivation through the procedures used is unacceptably high and that that risk could have been effectively addressed through additional procedural safeguards.

When the court balances the three *Mathews v. Eldridge* factors—that is, Superior's substantial interest in having a formal hearing, ED's minimal or moderate interest in not providing a formal hearing, and the unacceptable risk of an erroneous decision that could be reduced through additional procedural safeguards—the court finds that, prior to having its eligibility terminated, Superior was entitled to a relatively high level of procedural protection. The next question for the court then becomes whether the process that ED in fact provided to Superior equalled or surpassed the process that Superior was due under the Constitution.

### C. The Process Superior Received

█ This is not a case wherein the government beneficiary received no pretermination hearing whatsoever. In fact, Superior was allowed to make a number of written submissions and to have two or three in-person meetings with the decision maker. On the scale of procedures that could have been provided Superior, however, there is no doubt that the process devised by ED for this case was extremely informal: the proceedings were not adversarial; they were not on the record; Superior was not afforded the opportunity to present live testimony, nor to cross-examine ED's live testimony; there existed the possibility of improper *ex parte* contacts between DOJ officials and ED's decision makers; and the decision makers were not unquestionably independent and impartial. Furthermore, the minimal process that ED did provide to Superior was formless and unplanned, with fundamental decisions about the amount of procedure that would eventually be provided apparently being made in a casual manner as the entire

process moved along.[14] Therefore, because the court has already determined that Superior's status as an eligible institution is entitled to a relatively high level of procedural protection, the court now finds that the procedures actually provided by ED were inadequate under the due process clause of the federal constitution.

Having found the procedures that were provided by ED constitutionally inadequate, however, the court need not go further and precisely delineate those minimal procedures that *would* be constitutionally adequate in this case. This is because the court has already found that ED is statutorily required to provide Superior the procedures promulgated pursuant to section 1094, *see* Entry § II, *supra*, and the plaintiff has conceded that those section 1094 procedures would, in its view, be constitutionally adequate. *See* Transcript at 106–7. Furthermore, the court finds likewise: because the processes promulgated pursuant to section 1094 require nearly all of the procedural protections associated with a trial-type hearing, a section 1094 procedure would provide Superior with all of the process it is constitutionally due.[15]

## IV. *Conclusion*

Because ED's interpretation of the applicable regulations is unreasonable in light of the language and congressional intent underlying section 1094(c)(1)(D), Superior is entitled to prevail as a matter of law on its claim that ED denied the plaintiff its statutorily guaranteed rights under section 1094.

Because ED's February 1, 1989, decision adversely impacted upon Superior's constitutionally protected liberty and property rights and because Superior was entitled to greater procedural protections than were provided by ED, Superior is entitled to prevail as a matter of law on its claim that ED denied the plaintiff its constitutionally guaranteed rights under the due process clause.

Because of these findings it is unnecessary for the court to reach the plaintiff's claim under the Administrative Procedure Act or the plaintiff's claim of bias.

Furthermore, because these findings entitle the plaintiff to all of the relief it seeks, it will be unnecessary for the court to consider the "arbitrary and capricious" claims that were bifurcated and deferred (if necessary) to a later phase of the trial in this matter. *See* Second Supplementary Order of February 14, 1989.

In light of the above, the court hereby GRANTS the plaintiff's motion for summary judgment and DENIES the defendants' cross motion for summary judgment and motion to dismiss.

---

**14.** This statement should not be read as indicating that federal agencies are not free to fashion unique procedures to fit unique cases. *See, e.g., Beth Rochel Seminary v. Bennett,* 825 F.2d 478, 482 (D.C.Cir.1987) (noting that "[a]lthough the circumstances of this case are unique and the Department has never before done exactly what it did here, no one has suggested an agency has no discretion reasonably to interpret its prior rules and decisions to reach the unique circumstances that seem inevitably to arise in each case. Such an approach would make it impossible for the Department to apply general rules to specific situations and is therefore untenable.") There is a fundamental distinction, however, between the acceptable agency practice of fashioning new procedures and then applying them to a unique case, and the less acceptable agency practice of making up the procedures as it moves along and then retroactively attempting to justify what was done as adequate.

**15.** In order to assure that there is no confusion, the court emphasizes that it is *not* finding that the section 1094 procedures are constitutionally required in this case; rather, it is merely finding that, given the process Superior is due, the section 1094 procedures would be constitutionally *adequate.*