**ROSS UNIVERSITY SCHOOL OF MEDICINE, SCHOOL OF VETERINARY MEDICINE (ST. KITTS) LIMITED, Plaintiff,**

v.

**Lauro CAVAZOS, Defendant.**

**Civ. A. No. 89–0985–OG.**

United States District Court, District of Columbia.

May 9, 1989.

Thomas Hylden, Sachs, Greenbaum & Tayler, Washington, D.C., for plaintiff.

Charles Flynn, Asst. U.S. Atty., Washington, D.C., for defendant.

## MEMORANDUM

GASCH, District Judge.

This is an action for injunctive relief brought by Ross University against the Department of Education ("DOE"). In a letter dated March 24, 1989, the Department of Education informed Ross University that it intended to terminate the University's eligibility to participate in the student loan programs authorized by Title IV of the Higher Education Act of 1965 ("HEA"). The letter also informed plaintiff that DOE intended to impose a fine of $500,000 based on the violations set forth in the letter. If Ross wished to contest either of these sanctions, it was instructed to request a hearing or provide information by March 24 as to why the disciplinary action was not proper. In accordance with the regulations, any such hearing would take place before an Administrative Law Judge ("ALJ"). *See* 34 C.F.R. § 668.88 (1989). If Ross requested a hearing, the termination and fine would be stayed; in the absence of an objection the sanctions would take effect immediately.

The Department of Education also informed Ross that, effective immediately, funds were being withheld from Ross and its students and Ross' ability to obligate funds was removed. Although Ross could "request an opportunity to show cause why the Emergency Action is unwarranted,"

the emergency suspension would not be stayed. Moreover, there would be no hearing before an ALJ. 34 C.F.R. § 668.83.

Ross University contests the legality of the Secretary's emergency action. The Court issued a temporary restraining order on April 17, 1989, effectively vacating the imposition of the emergency suspension. The parties requested an extension of the Order until May 5. Before the Court are plaintiff's motion for preliminary injunction and defendant's motion for summary judgment.[1]

## I. FACTS

Plaintiff Ross University School of Medicine, School of Veterinary Medicine (St. Kitts) Limited ("Ross University" or "Ross") owns and operates the Ross University School of Veterinary Medicine, The Ross University School of Medicine, and the Ross University Information Systems Institute, all located in the West Indies. The veterinary school is located in St. Kitts and since October 1984, has been eligible to participate in various student loan programs authorized by Title IV of the HEA. These include the Guaranteed Student Loan Program ("GSL"), Supplemental Loans for Students ("SLS"), and PLUS loans. The medical school is located in the Commonwealth of Dominica and was declared eligible to participate in Title IV loan programs in December, 1983. The present action primarily involves activity at Ross' Information Systems Institute, which is located in Antigua.

### A. *The Antigua location*

In 1986, Ross added business and information systems programs ("computer courses") to the curriculum of the veterinary school. One of the principal disagreements between the parties is whether the Information Institute in Antigua was, or should have been, declared eligible to participate in Title IV loan programs by the Secretary. Therefore, the process sur-

---

**1.** The government filed a single memorandum in support of both its motion for summary judgment and its opposition to plaintiff's motion for preliminary injunction. By ruling on the summary judgment motion at a later date, the Court can consider the question of final relief in a more deliberate fashion.

rounding Ross' application for the Information Institute to participate in the GSL program deserves close examination.

On September 26, 1986, Dr. James Cassidy, President of Ross University, wrote the Department of Education seeking approval for the Ross University School of Medicine Information Systems Educational Program to participate in the GSL program. Exhibit A, Cooley Declaration. The application, signed by Dr. Robert Ross, Chairman of the Board, stated that "this application is for new programs to be established in the medical school for which GSL eligibility has already been established." *Id.* at 5. By including the new program in the University's current GSL eligibility, Ross avoided having to wait two years after the program had been in existence before applying for eligibility. *See* 20 U.S.C. § 1085(c)(3).

The application explained that Ross University had campuses located on both St. Kitts and Dominica. The application made no mention of any campus on Antigua. On January 9, 1987, the Department of Education informed Ross that three of Ross' proposed courses of study in information systems qualified for inclusion under Ross University's existing eligibility. Exhibit B, Cooley Declaration. The letter noted that the eligibility applied only to Ross' Dominica location. On April 6, 1987, the Department wrote "[t]he January notification incorrectly indicated a . . . Dominica location. We have changed our records to reflect the [St. Kitts] address." *Id.* The letter thanked Dr. Ross for calling the error to the Department's attention.

Ross University contends that Dr. Ross informed Mr. Cooley of the Department of Education by phone that the information systems institute was to be located on Antigua. Dr. Ross avers that he phoned Cooley after receiving the January letter, after receiving the April letter, and again in September, attempting to correct the misunderstanding. Attachment to Plaintiff's Exhibit B. Dr. Ross wrote the Department on October 9, 1987, explaining that "the branch for which we requested approval is in Antigua." Exhibit Two, Plaintiff's Statement of Genuine Issues. Plaintiff has also submitted a declaration from its General Counsel stating that he met with Department officials in July, 1988 concerning complaints made by Ross students about the Antigua campus, yet Ross' eligibility to disburse funds in Antigua was not questioned. Exhibit three, Plaintiff's Statement of Genuine Issues.

### B. *Improprieties at Antigua*

From February 26 to March 6, 1988, Department of Education officials conducted a program review of Ross University. Ross was informed by letter on February 6 that a program review would take place, but the letter did not explain which campuses would be visited or the particular dates of the visits. McKiernan Declaration at ¶ 5. The review was prompted by complaints from Ross students and a report from the United States Embassy in Antigua. Department officials visited plaintiff's St. Kitts and Antigua locations as well as its administrative offices in New York.

At the Antigua location, Ross officials were not expecting the visit and the administrative files were in a state of disarray. Department officials found numerous problems with the administration of the Information Institute. In addition to incomplete and unorganized academic and financial aid files, the reviewers found that all 90 Institute students were GSL and SLS recipients. McKiernan Declaration at ¶ 5. The reviewers concluded that there were substantial violations of the regulations concerning financial accountability and recordkeeping. In particular, the reviewers concluded that Ross: (1) used commissioned salespersons to promote loan programs, (2) was not eligible to disburse Title IV funds at the Antigua location, (3) misrepresented itself as an employer in its advertising, (4) falsely informed students that Title IV loans must be retained by Ross and disbursed on an incremental basis to the students and (5) lacked administrative ability to execute its fiduciary responsibilities.

In addition to considering the above, the reviewers considered broader problems which allegedly afflicted the Information Institute. They considered the computer

facilities and instructional program to be inadequate. The reviewers met with students at their residence and found living conditions to be "squalid and dirty." McKiernan Declaration at ¶ 8. The students allegedly related misrepresentations made by Ross officials concerning the quality of living quarters. They also "reported that they had been required to turn over their airline tickets, entry cards and identification to school authorities. Students felt that there was a concerted effort to force them to stay on the island until they signed their loan checks." McKiernan Declaration at ¶ 9.

Ross University vigorously denies the accuracy of the Department's account of affairs on Antigua. Numerous affidavits have been submitted by Ross students declaring their satisfaction with the educational program and with living conditions. Exhibit 5, Plaintiff's Statement of Genuine Issues.

Following the review, Department officials met with representatives of Ross University in New York on March 8 to explain their findings and allow Ross officials to comment. At that meeting Department officials indicated that they would recommend that the eligibility of Ross University School of Veterinary Medicine be terminated. McKiernan Declaration at ¶ 12. A Ross attorney submitted a declaration averring that Department officials were inconsistent and not forthright at this exit interview in explaining the basis for their findings. Exhibit 6, Plaintiff's Statement of Genuine Issues.

The reviewers subsequently recommended that emergency action be taken in addition to termination proceedings. The Department contends that emergency action was needed (1) "to prevent a large amount of GSLs being improperly committed for students at an ineligible location," (2) because "misrepresentations found to have been made to students dramatically increased the likelihood of loan defaults," (3) because commissioned salespersons were inducing students to receive loans, and (4) "the administrative defects were so substantial and systematic that there was little possibility that interim measures could assure the proper use of federal funds." McKiernan Declaration at ¶ 13.

## II. DISCUSSION

To prevail on a claim for injunctive relief in this jurisdiction, movants must demonstrate: (a) a strong likelihood of success on the merits; (b) that without an injunction they will be irreparably injured; (c) that issuance of an injunction will not substantially injure others; and (d) that the public interest favors injunction. *Virginia Petroleum Jobbers Ass'n v. FPC*, 259 F.2d 921, 925 (D.C.Cir.1958) (per curiam).

### A. *Success on the Merits*

Ross University challenges the emergency action on three grounds: (1) that it violates the enabling legislation; (2) that it violates Ross' Due Process rights; and (3) that the facts recited by the Secretary as the basis for the emergency action do not justify emergency action. Because the Court holds that there was no statutory authority for the Secretary's emergency action, plaintiff's second and third arguments are not addressed.

At 34 C.F.R. § 668.83, the Secretary has set out the procedures for imposing emergency action. The regulation provides:

(a) *Scope and consequences.* The Secretary, [sic] may take an emergency action against an institution under which the Secretary withholds funds from the institution or its students and withdraws the authority of the institution to obligate funds under any or all Title IV, HEA programs if the Secretary—

(1) Receives information, determined by the official to be reliable, that the institution is violating applicable laws, regulations, special arrangements or limitations;

(2) Determines that immediate action is necessary to prevent misuse of Federal funds; and

(3) Determines that the likelihood of loss outweighs the importance of following the procedures set forth in this subpart for suspension, limitation or termination.

(b) *Procedures.* A designated department official begins an emergency action

by notifying the institution, by certified mail with return receipt requested, of the emergency action and the basis on which the action is taken. The notice also states that the institution has an opportunity to show cause that the emergency action is unwarranted. The effective date of the action is the date on which the notice is received by the institution.

(c) *Duration.* An emergency action may not exceed 30 days unless a suspension, limitation or termination proceeding is begun under this subpart before the expiration of that period. In such case, the period may be extended until the completion of that proceeding, including any appeal to the Secretary.

(d) *Opportunity to show cause.* The Secretary provides the institution, if it so requests, an opportunity to show cause that the emergency action is unwarranted.

(Authority: 20 U.S.C. 1094)

34 C.F.R. § 668.83 (1989). The regulation clearly specifies that its authority is based on 20 U.S.C. § 1094.

Section 1094 provides that the Department may take three types of action against participating institutions that are not in compliance with the statutory or regulatory requirements. Suspension or termination is proper

> upon determination, *after reasonable notice and opportunity for a hearing on the record,* that an ineligible institution has engaged in substantial misrepresentation of the nature of its educational program....

*Id.* § 1094(c)(2)(A) (emphasis added). A civil penalty is properly imposed,

> upon determination, *after reasonable notice and opportunity for a hearing on the record,* that an eligible institution—
> (I) has violated or failed to carry out any provision ...; or
> (II) has engaged in substantial misrepresentation of the nature of its educational program....

*Id.* § 1094(c)(2)(B) (emphasis added).

The Department is given authority to promulgate regulations as necessary to provide for:

> the *limitation, suspension,* or *termination* of the eligibility for any program under this title of any otherwise eligible institution, or the imposition of a civil penalty ... whenever the Secretary has determined, *after reasonable notice and opportunity for hearing on the record,* that such institution has violated or failed to carry out any provision of this subchapter....

20 U.S.C. § 1094(c)(1)(D) (1988 Supp.) (emphasis added). In sum, the statute makes no provision for an emergency action and requires that all agency action take place only after reasonable notice and opportunity to be heard on the record.

Plaintiff contends that the regulations conflict with and exceed the enabling legislation. Defendant concedes that 20 U.S.C. § 1094, with its enumeration of three specific nonemergency penalties and reasonable notice and opportunity to be heard on the record, does not authorize emergency action. But defendant argues that a statutory provision giving the Department of Education the authority to "prescribe such regulations as may be necessary to carry out the purposes" of the GSL program provides authority for the emergency action regulation. *See* 20 U.S.C. § 1082(a)(1). Defendant contends that this general authority, coupled with the fact that the emergency action regulation has existed almost fifteen years, demonstrate that emergency action is properly authorized.

Section 1082(a)(1) was enacted in 1965 in Title IV of the HEA. *See* Higher Education Act of 1965, Pub.L. No. 89–329, § 432(a)(1), 79 Stat. 1246 (1965) (codified at 20 U.S.C. § 1082(a)(1)). The limitation, suspension, or termination regulations, including a provision for emergency action, were first adopted in 1975. 40 Fed.Reg. 7597 (Feb. 20, 1975) (appearing at 45 C.F.R. § 177.76 (1975)). At that time they applied only to the GSL program. The 1975 regulations cited two sources of statutory authority: 20 U.S.C. § 1087-1 (providing for limitation, suspension and termination of participation *after* notice and hearing) and 20 U.S.C. § 1082(a).

Shortly after the GSL regulations were adopted, Congress passed the Education Amendments of 1976 which, in part, directed the Department to make the GSL regulations concerning limitation, suspension, and termination applicable to all Title IV programs. *See* Pub.L. No. 94–482, 90 Stat. 2150 (1976) ("the Commissioner is directed to issue a comprehensive revision of the regulations"). The regulations, including the provision for emergency action, were subsequently revised to apply to all Title IV programs. *See* 42 Fed.Reg. 64,566, 64,568 (Dec. 23, 1977).

Defendant contends that the congressional directive in the 1976 amendments to make the regulations (which contained the emergency action provision) applicable to all Title IV programs suggests that Congress has ratified the emergency action procedure. Defendant also notes that Congress has amended 20 U.S.C. § 1094 on several occasions, but has never expressed dissatisfaction with the emergency action regulation.

Plaintiff argues that the specific enumeration of authority in the statute precludes any reliance on the tacit approval of Congress or the general authority conferred in Section 1082(a).[2] Under the maxim *expressio unius est exclusio alterius*, the limitations on the Department's authority in Section 1094 restrict the broader grant of authority in Section 1082(a). *See National R.R. Passenger Corp. v. National Ass'n of R.R. Passengers*, 414 U.S. 453, 458, 94 S.Ct. 690, 693, 38 L.Ed.2d 646 (1974). Another example of a limitation on the broad authority in 20 U.S.C. § 1082(a) is provided by 20 U.S.C. § 1082(h)(1)(A), which requires the Department to provide "reasonable notice and an opportunity for a hearing" before imposing sanctions on lenders. This principle of statutory construction may be controverted by clear evidence of legislative intent. *Id.* But there is no contrary legislative intent in this case. In fact, the statutory and legislative history relied on by the defendant does not at all suggest that Congress has approved the emergency action regulation.

In the 1976 amendments, Congress instructed the Department to apply its enforcement regulation to all Title IV programs, not just the GSL program. Pub.L. 94–482, § 133(b) 90 Stat. 2150 (1976). The regulation provided procedures for "Suspension" and "Limitation and termination." 45 C.F.R. § 177.77 (1975). An ALJ hearing was required for termination and limitation actions. The "Suspension" subsection provided for notification and an informal meeting *before* the suspension took effect. *Id.* at § 177.76. Unlike the present regulation, there was no separate "Emergency Action" subsection; the emergency action provision was a subpart of the "Suspension" subsection. An emergency action without notice could last only seven days (not thirty days as the present regulation provides), at which time a hearing was required. *Id.*

Congress expressed its dissatisfaction with the absence of an ALJ hearing in suspensions and emergency actions by amending the statute in 1976 to add the requirement that all hearings be "on the record." The regulation was changed to provide an ALJ hearing for suspensions, *but not for emergency actions*. Thus, congressional approval of the regulation cannot be inferred from the directive to apply the then-existing GSL regulation to all Title IV programs since Congress also instructed the Department to revise the regulation and the Department failed to do so.

The Court's holding on this point is supported by the only case on point, *Continental Training Services v. Cavazos*, 709 F.Supp. 1443 (S.D.Ind.1989). In *Continental Training*, the plaintiff was a for-profit vocational education institution. In 1980 the institution was deemed eligible to participate in certain Title IV loan programs.

---

**2.** Defendant correctly notes that an agency's interpretation of its statutory authority is entitled to great weight. *EPA v. National Crushed Stone Ass'n,* 449 U.S. 64, 83, 101 S.Ct. 295, 306, 66 L.Ed.2d 268 (1980); *Costanzo v. Tillinghast,* 287 U.S. 341, 345, 53 S.Ct. 152, 153, 77 L.Ed. 350

(1932). But questions of statutory construction are decided without deference to agency interpretation when the statute is unambiguous on its face. *INS v. Cardoza–Fonseca,* 480 U.S. 421, 107 S.Ct. 1207, 1221, 94 L.Ed.2d 434 (1987).

In early 1987, the school was audited by Department of Education officials. At their exit interview the officials informed school officials that they had determined that the school was not in compliance with the regulatory requirements and thus was not eligible to participate in the Title IV programs. School officials subsequently met informally with Department officials on three occasions and submitted three written briefs. School officials sought a formal hearing, but their request was denied.

The Department issued a 75–page opinion on February 1, 1989, which terminated plaintiff's eligibility effective immediately. At issue in *Continental Training* was the reasonableness of the Department's view that because the school was never eligible, the notice and hearing requirements of the regulation and the statute did not apply. The Department did not rely on the emergency action provision. The Court held that the Department's interpretation of the regulations "violate[d] the clear congressional purpose undergirding section 1094." The Court's reasoning is instructive:

> Congress clearly intended to provide procedural protections for the settled expectations of those institutions that have been deemed eligible to receive Title IV funds, and that manifest congressional intent may not be thwarted through convoluted verbal gymnastics that unreasonably attempt to label what ED did to Superior on February 1, 1989, as anything other than what it was: a termination of eligibility.

*Continental Training*, 709 F.Supp. at 1450. Similarly, the Department's action in the instant action is nothing more than a suspension without notice and hearing.

In conclusion, the defendant's argument that the Secretary has inherent authority to promulgate the regulation despite the specific procedural safeguards enunciated in 20 U.S.C. § 1094 is unconvincing. Therefore, plaintiff has demonstrated the requisite likelihood of success on the merits.

### B. *Irreparable Injury*

Plaintiff contends that it would suffer irreparable injury if its students could not receive loans through the federal loan guarantee program. The Department found that all of Ross' Information Institute students were GSL and SLS recipients. McKiernan Declaration, ¶ 5. Students wishing to enroll in the May 15 semester would be unable to apply for federally guaranteed loans in the absence of an injunction. Given the large number of students who apparently pay their tuition with Title IV loans, Ross' claim that it could be bankrupt in the absence of an injunction is credible.

### C. *The Public Interest and Harm to Others*

The Court previously found that the emergency action injured the students at Ross University and that the public interest favored issuance of an injunction and compliance with the statute.