**CONTINENTAL TRAINING SERVICES, INC. d/b/a Superior Training Services, Plaintiff–Appellee,**

v.

**Lauro CAVAZOS, Secretary of Education, et al., Defendants–Appellants.**

**Nos. 89–1694, 89–1799.**

United States Court of Appeals, Seventh Circuit.

Argued June 8, 1989.

Decided Jan. 10, 1990.*

* This opinion was circulated to all the judges of this court in regular active service pursuant to Circuit Rule 40(f) because of a possible conflict with *Beth Rochel Seminary v. Bennett*, 825 F.2d 478 (D.C.Cir.1987). A majority of the judges did not favor a rehearing *en banc*.

Don A. Tabbert, Tabbert & Ford, Indianapolis, Ind., Randall J. Turk, Herbert J. Miller, Jr., Martin D. Minsker (argued), Miller, Cassidy, Larroca & Lewin, Washington, D.C., for plaintiff-appellee.

Deborah J. Daniels, U.S. Atty., Charles Goodloe, Jr., Asst. U.S. Atty., Timothy M. Morrison, Indianapolis, Ind., Douglas Letter (argued), William Kanter, Dept. of Justice, Civ. Div., Appellate Staff, Michael F. Hertz, Stephen D. Altman, Marie Therese Connolly, Linda M. Anderson, U.S. Dept. of Justice, Civ. Div. Washington, D.C., for defendants-appellants.

Before BAUER, Chief Judge, and CUDAHY and KANNE, Circuit Judges.

CUDAHY, Circuit Judge.

This case turns upon the proper interpretation of the word "otherwise"—and upon the degree of deference owed to the interpretation of the United States Department of Education (the "DE," the "Depart-

ment"), the agency charged with administering the statute in which the word appears. If we accept the Department's reading of the word "otherwise," we must reverse the district court's grant of summary judgment to the plaintiff. Although the issue is a difficult one, we affirm because—even considering the Department's claim to deference on issues of statutory interpretation—its reading of the statute conflicts with the plain meaning of the statutory language. Further, the district court found that the defendants had violated the plaintiff's constitutionally-guaranteed due process rights, 709 F.Supp. 1443. While accepting much of the district court's reasoning, we reach a different conclusion on due process because the plaintiff received all the process that was constitutionally due.

## I.

The plaintiff, Continental Training Services, Inc. d/b/a Superior Training Services ("Superior"), offers correspondence and residential training courses in truck driving and heavy equipment operation.[1] In 1980, seven years after Superior opened its doors, the Department of Education determined that Superior qualified as an institution whose students could receive federal student financial aid under the Higher Education Act ("HEA," the "Act").[2] *See* 20 U.S.C. § 1070 *et seq.* Superior was deemed eligible and participated in government aid programs from 1980 through 1987. In 1987, however, the DE began an audit of Superior because of concerns that Superi-

or's courses did not comply with statutory and regulatory requirements. A particular focus of the DE's audit was the length of courses offered by Superior; under the applicable eligibility rules, institutions had to provide courses meeting certain "clock hour" requirements.[3]

In May of 1987 the DE's auditors gave Superior informal notice that there might be a problem with course length. On December 9, 1987, the auditors held a formal exit interview in which they officially notified Superior that there was indeed a problem with course length. Nine months later, on September 1, 1988, the DE issued a "draft" audit report formalizing this conclusion. Within a week the Department of Justice (the "DOJ") filed a False Claims Act action against Superior, relying in large part upon the DE's draft audit. On September 15, representatives of Superior met with DE and DOJ officials. At this meeting the DE notified Superior that it would be suspending Superior's eligibility for GSL and Pell Grant loans forthwith—and gave Superior one day to file any written response it wished to lodge.

The "process" that Superior subsequently requested and received from the DE can be summarized as follows:

(1) On September 16, Superior was permitted to submit a 32–page document substantiating its eligibility;

(2) On September 20, Superior argued its case orally before Kenneth Whitehead, the Assistant Secretary for Postsecondary Education;

**1.** We refer to the fuller discussion in the district court opinion for a more detailed review of the facts and procedural history. *Continental Training Servs., Inc. d/b/a Superior Training Servs. v. Cavazos,* 709 F.Supp. 1443 (S.D.Ind. 1989) ("*Continental I*").

**2.** In 1980, the Department permitted Superior to participate in the Guaranteed Student Loan ("GSL") program, *see* 20 U.S.C. §§ 1071 to 1087–2, and by 1983 Superior was also declared eligible for participation in the Pell Grant program. *See* 20 U.S.C. §§ 1070a to 1070a–6.

**3.** The statutory provisions give more general guidelines—requiring, for example, that institutions be accredited, 20 U.S.C. §§ 1085(c), 1088(a)–(c), 1141(a), and that institutions provide "not less than a 6–month program of train-

ing to prepare students for gainful employment in a recognized occupation." 20 U.S.C. § 1088(b). Particular "clock hour" requirements for course length are specified in regulations. For example, in order to qualify, "vocational school" courses must involve a minimum of 300 clock hours of instruction and must average 12 hours of preparation per week. 34 C.F.R. §§ 600.7(a)(3)(iii), 600.7(a)(4) (1988). In order for correspondence courses to qualify under the Pell Grant program, they must involve at least 600 clock hours of study. 34 C.F.R. §§ 600.2, 600.5(a)(5)–(6) (1988). A correspondence course "clock hour" is defined by the regulations as 60 minutes of preparation and study. 34 C.F.R. § 600.2 (1988).

(3) On October 4, Superior submitted a second written document (135 pages long);

(4) On October 7, Superior made a second oral presentation to Whitehead;

(5) On October 20, Superior supplemented its second written submission with yet more written material;

(6) On November 15, 1988, Superior submitted more written material in response to materials presented to Whitehead by the government.

Although draft audit reports are generally reviewed and put in final form pursuant to statutory requirements, the DE did not put its audit of Superior in final form. Superior requested a formal "on-the-record" hearing before the DE prior to any suspension or termination of its eligibility status. The DE declined to provide such a hearing, taking the position that no formal procedures were mandated by statute prior to revocation of an institution's formal eligibility status.

On February 1, 1989, Whitehead revoked Superior's eligibility under the Pell Grant and student loan programs [4] in a 75-page opinion detailing Superior's failure to meet course length requirements. Superior immediately filed this action in the district court, seeking to prevent implementation of Whitehead's decision through a temporary restraining order, a preliminary injunction and a permanent injunction. Superior's complaint was in six counts, alleging initially that the DE's refusal to grant a formal hearing (1) violated Superior's constitutional due process rights; (2) violated the notice and hearing requirements of the Higher Education Act; (3) violated the DE's published regulations regarding suspension, limitation and termination of eligibility status; and (4) violated the procedural requirements of the Administrative Procedure Act ("APA"). The complaint further alleged that the DE's consequent revocation of Superior's eligibility constituted (5) arbitrary and capricious action in violation of the APA and (6) a denial of equal protec-

tion and due process guaranteed by the Constitution.

The district court granted a temporary restraining order on February 7, 1989. On February 14, the court bifurcated the case, proceeding first to deal with the procedural issues raised by the first four counts of the complaint (and reserving for future proceedings consideration of the merits of the eligibility determination itself). On March 13, the court granted Superior's request for a preliminary injunction. On April 10, the court granted summary judgment to Superior on its statutory and due process claims and permanently enjoined the DE from revoking Superior's eligibility status until it had accorded Superior an "on-the-record" hearing in accordance with the provisions of the HEA. The district court also concluded that this disposition rendered unnecessary any further consideration of the issues raised by the remaining counts of the plaintiff's complaint. The government appeals both the preliminary injunction and the permanent injunction.

## II.

■ We pause to review the jurisdictional situation of the case. We have before us two appeals—one from the grant of a preliminary injunction and one from the grant of a permanent injunction. Under 28 U.S.C. section 1292(a)(1), this court has jurisdiction of interlocutory district court orders "granting, continuing, modifying, refusing or dissolving injunctions...." *See Buckhanon v. Percy,* 708 F.2d 1209, 1212 (7th Cir.1983). However, where a permanent injunction has been granted that supersedes the original preliminary injunction, "the interlocutory injunction [ ] become[s] merged in the final decree," *Smith v. Illinois Bell Tel. Co.,* 270 U.S. 587, 588, 46 S.Ct. 408, 409, 70 L.Ed. 747 (1926), and the appeal from the interlocutory preliminary order is properly dismissed. *Id.* at 589, 46 S.Ct. at 409; *Milonas v. Williams,* 648 F.2d 688, 689 n. 1 (10th Cir.1981); *Securities & Exch. Comm'n v. First Fin.*

---

**4.** This apparently included not only GSL loans but also loans under two additional programs for which Superior was eligible: the Parental Loans to Undergraduate Students "PLUS" program and the Supplemental Loans to Students "SLS" program.

*Group of Texas*, 645 F.2d 429, 433 (5th Cir.1981). The appeal in No. 89–1694 is therefore dismissed as moot.

■ We have jurisdiction of the appeal in No. 89–1799, in which the district court granted the plaintiff summary judgment and a permanent injunction, under 28 U.S.C. section 1291. The district court's order granted the plaintiff all the relief requested in the complaint, thereby concluding all proceedings in the district court; the order is clearly appealable as a final order.[5] *Cf. Foremost Sales Promotions, Inc. v. Director, Bureau of Alcohol, Tobacco and Firearms*, 812 F.2d 1044, 1045–46 (7th Cir.1987); *Reytblatt v. Denton*, 812 F.2d 1042, 1044 (7th Cir.1987); *Maneikis v. Jordan*, 678 F.2d 720, 721 (7th Cir.1982).

### III.

### A.

■ The district court first concluded that Superior prevailed "as a matter of law" on its claim that the Department had denied the plaintiff procedural rights guaranteed under 20 U.S.C. section 1094(c)(1)(D). Section 1094(c), entitled "Audits; financial responsibility; enforcement of standards," provides that

> (1) ... the Secretary is authorized to prescribe such regulations as may be necessary to provide for—

(A)(i) ... a financial and compliance audit of an eligible institution ... at least once every 2 years

·      ·      ·      ·      ·

(D) the limitation, suspension, or termination of the eligibility for any program under this subchapter ... of any otherwise eligible institution, or the imposition of a civil penalty under paragraph (2)(B) whenever the Secretary has determined, after reasonable notice and opportunity for hearing on the record, that such institution has violated or failed to carry out *any provision* of this subchapter ... or any regulation prescribed under this subchapter ... except that no period of suspension under this section shall exceed 60 days unless ... limitation or termination proceedings are initiated by the Secretary within that period of time.

20 U.S.C. § 1094(c)(1) (emphasis added). The "subchapter" to which the statute refers is Subchapter IV, which contains most of the statutory provisions for the student financial aid programs provided for by the HEA—including, of course, the basic eligibility criteria.

Subsection (2) of section 1094(c) permits suspensions or terminations of eligibility where institutions have substantially misrepresented their programs:[6]

---

**5.** We note that the plaintiff has carefully preserved alternate grounds for relief, grounds the district court found unnecessary to consider in light of its disposition of the case. *See* Brief of Appellee at 49 & n. 59. These arguments remain viable alternative grounds for disposition of the case in this court. *See Herman v. City of Chicago,* 870 F.2d 400, 403 (7th Cir.1989) ("grounds preserved in the district court may be urged here, without a cross-appeal, to sustain the judgment").

**6.** The district court assumed that this provision applies where an institution has misrepresented its programs *to the Department;* the Department urges that it applies where the institution misrepresented its programs *to students. See* Brief of Appellee at 30 n. 14. The plain language of the statute does not limit the provision in either way. To the extent that the surrounding language gives guidance, it would tend to indicate that misrepresentations to the Department are at issue, as it is clearly the Department which is charged with discovering and punish-

ing the violations described in the surrounding paragraphs—while *students are nowhere mentioned.* The plain language of the statute certainly would not support *excluding* misrepresentations to the Department.

The legislative history does provide some support for the Department's position because this provision originally explicitly included "false advertising" along with "substantial misrepresentation"; the Conference Report notes that references to "false advertising" were struck because false advertising problems would be "included in substantial misrepresentation." H.R. Conf.Rep. No. 94–1701, 94th Cong., 2d Sess. 201 (1976). On the other hand, that misrepresentations clearly aimed at students might be included under "substantial misrepresentations" *does* not mean that misrepresentations aimed at the Department would be excluded. Representative O'Hara, chairman of the subcommittee that authored the House version of the bill (which was substantially accepted in the finally enacted version), states the overall purpose of this section

(2)(A) Upon determination, after reasonable notice and opportunity for a hearing on the record, that an eligible institution has engaged in substantial misrepresentation of the nature of its educational program, its financial charges, or the employability of its graduates, the Secretary may suspend or terminate the eligibility status for any or all programs under this subchapter ... of any otherwise eligible institution, in accordance with procedures specified in paragraph (1)(D) of this subsection, until the Secretary finds that such practices have been corrected.

20 U.S.C. § 1094(c)(2)(A). The Secretary may also impose civil penalties upon non-complying institutions:

(2)(B)(i) Upon determination, after reasonable notice and opportunity for a hearing on the record, that an eligible institution—

(I) has violated or failed to carry out any provision of this subchapter ... or any regulation prescribed under this subchapter ... or

(II) has engaged in substantial misrepresentation of the nature of its educational program, its financial charges, and the employability of its graduates, the Secretary may impose a civil penalty upon such institution of not to exceed $25,000 for each violation or misrepresentation.

20 U.S.C. § 1094(c)(2)(B).

A "plain meaning" reading of this statutory language appears fairly straightforward. Section 1094(c) begins with a provision for financial *and compliance* audits of institutions that have been granted eligibility status (subsection (1)(A)(i)). (The Department in the case before us based its revocation of Superior's eligibility status upon an audit designed to ascertain Superior's compliance with program requirements and regulations.) Subsection (1)(D) provides for "limitation, suspension or termination" of eligibility after a hearing on the record when it is discovered that an institution that has "otherwise" been deemed eligible is not in compliance with "any provision" of the federal aid programs delineated in Subchapter IV of the HEA ("Student Assistance").

If we rely only upon the language of the statute, the word "otherwise" has only one possible referent within the subsection in which it occurs: it refers ahead to the phrase "violated or failed to carry out." An institution that has "violated or failed to carry out any provision of this subchapter" may well be technically "ineligible"; the word "otherwise" signals us that we are dealing with an institution whose eligibility status is in question. In other words, the institution would "otherwise"—meaning "apart from this alleged violation"—be an eligible institution. The statute could not properly employ the term "ineligible" at this juncture, because a central point of this subsection is precisely to provide for procedural protections to be followed in determining whether a perceived violation should be the ground for revoking eligibility. At the same time, the term "eligible" might similarly appear to assume what is to be decided through the notice-and-hearing procedure provided for in the statute. Use of the term "otherwise eligible" seems an entirely straightforward way of explaining the situation; the institution is and has been eligible apart from the alleged violation that is the subject of the inquiry. If it turns out that the violation has indeed occurred, the institution may no longer be "eligible." (This actually tends to imply that the kind of violations at issue in this subsection are violations of fundamental eligibility requirements which, if proven, would affect eligibility status.) The provision on its face is not limited in scope to particular kinds of violations. Indeed, it employs very broad language; suspension, limitation or termination of eligibility in response to violation of *"any* provision" of the student financial aid programs delineated in Subchapter IV—or of any regulation

---

as "protecting the interests of the Government and of the consumer of higher education services—the student." 122 Cong.Rec. 13496 (1976). This would seem to support a "plain language"

reading of section 1094(c)(2)(A) applying the provision to "substantial misrepresentations" of all kinds, regardless of their intended audience.

prescribed under Subchapter IV—will trigger the procedures delineated by section 1094(c)(1)(D).

This reading is bolstered by the repeated use of the term "otherwise eligible" in the following subsection, 28 U.S.C. § 1094(c)(2)(A), in which the statute provides for notice-and-hearing prior to suspension, limitation or termination where an institution has substantially misrepresented aspects of its program. Here the term "otherwise" similarly signals that the institution in question has been deemed eligible apart from the potential departures from eligibility attributable to the alleged misrepresentations. Under the statute, these misrepresentations may pertain to the nature of an institution's educational program, its financial charges or the employability of its graduates—a list that unambiguously includes criteria that would have been the subject of an original eligibility determination.

These two subsections, then, provide procedures to be followed before limitation, suspension or termination of eligibility in response to an institution's violation or failure to carry out program provisions (section 1094(c)(1)(D)) or to an institution's substantial misrepresentations about its program (section 1094(c)(2)(A)). The procedural requirements apply whether the violations or misrepresentations go to aspects of program management or more fundamental questions of an institution's compliance with basic eligibility requirements.[7] (As we have noted, this conclusion is apparent from the phrase "otherwise eligible" itself, which indicates that hearings under either subsection (c)(1)(D) or (c)(2)(A) might call into doubt the basic eligibility determination.) Where the Department seeks to revoke previously granted eligibility because of program provision violations or substantial misrepresentations by an institution, "reasonable notice and opportunity for a hearing on the record" are required under these two subsections.

The next subsection (1094(c)(2)(B)) permits imposition of a civil fine in case of either failure to carry out program provisions or substantial misrepresentations, and repeats much of the language of the previous subsections. Here again, notice and opportunity for a hearing on the record are required. Interestingly, the civil fine subsection does not use the term "otherwise eligible" but merely uses the term "eligible"—an omission that tends to suggest that the word "otherwise" in this situation does not carry any strong or technical limiting meaning, because this subsection in other respects echoes the previous two subsections and appears to be aimed at providing the Secretary with the alternative of imposing fines instead of revoking eligibility under conditions identical to those described in sections 1094(c)(1)(D) and (c)(2)(A). Use of the terms "eligible" and "otherwise eligible" interchangeably in these three subsections would seem to indicate that the subsections are not applicable to initial eligibility determinations, at a point before an institution has formally been deemed "eligible," but rather to revocation of already-established eligibility or to fines levied against institutions that have previously been granted eligibility by the Department.

The plain meaning of the statute is thus fairly unproblematic and appears to mandate a hearing on the record whenever the Department seeks to revoke the eligibility of an institution that previously has been deemed eligible in all other respects ("otherwise").[8] The parties agree that the De-

---

7. And if an institution is not complying with a fundamental eligibility requirement of the program—or has misrepresented an aspect of its situation relevant to the initial eligibility determination—then the correctness of the original eligibility determination itself might indeed be called into question. The statute on its face contains no indication that cases in which the original eligibility determination is called into question should be treated any differently from other cases; indeed, the language of the statute

seems quite clearly to require hearings in cases where an institution has violated a fundamental eligibility requirement of the subchapter programs (regardless of when the violation occurred—no time limit is stated) or has represented that it was eligible when it was not.

8. We note that there is no basis in the statute for the sort of "sliding scale" suggested by the district court; once an institution is deemed "eligible," section 1094(c)(1)(D) is triggered. It may

partment did not give Superior a predeprivation hearing on the record as required under section 1094(c). They further agree that the Department sought to revoke previously granted eligibility status because Superior was in violation of program provisions and regulations prescribed under Subchapter IV (the "Student Assistance" subchapter). Were we merely charged with reading the statute to determine its meaning, our task would be complete. However in this case we are faced with an additional question; we must determine what weight should be given the Department's reading of the statute, which is at odds with the "plain meaning" reading we have elaborated.

The Department would have us read "otherwise eligible" as an indication that section 1094 does not apply in cases where the fundamental eligibility determination is in question. Its reading would confine section 1094 to cases in which subsequent audits or investigations turn up violations of "program implementation rules" rather than fundamental eligibility requirements. Brief of Appellee at 24. There is no language in the statute expressly limiting section 1094 to violations of "program implementation rules." The Department can point to no words in the statute other than the phrase "otherwise eligible" to bolster its reading; this reading of course completely ignores the fact that violations of "any provision of this subchapter" or "any regulation prescribed under this subchapter" are explicitly included in section 1094(c)(1)(D).[9] It is furthermore entirely

unclear, as we have indicated above, how the words "otherwise eligible" can be interpreted as *excluding* cases in which fundamental eligibility determinations are brought into question; rather, the phrase "otherwise eligible" seems expressly to contemplate that some aspect of fundamental eligibility might be under reconsideration.

Nevertheless, the Department argues that Congress intended to require hearings only for "determinations *other than* eligibility." Brief of Appellants at 23. It is hard to reconcile this reading with the express language of the statute, which speaks specifically of "the limitation, suspension, or termination of the *eligibility*" of institutions' programs. There is probably no word or phrase around which parties could not spin conflicting meanings, given the opportunity and incentive. However, even given this limitation to "plain language" arguments generally, this case presents as clear an example of an administrative interpretation that contravenes plain statutory language as we are likely to see.

The Department has several other arguments for its interpretation centering upon legislative history and upon the regulations generated by the Secretary pursuant to the HEA. But before we entertain these arguments, we must first consider our role relative to that of the Department where the Department appears to be advocating an approach in flat contradiction to

---

be true that for purposes of a due process analysis, the weight of Superior's interest in eligibility grew with time, as it came to depend more heavily upon government-funded financial aid programs for its students. But the statute provides no basis for distinguishing between schools that have been deemed eligible for two months or twenty years; it simply provides for hearings in cases where the Department seeks to revoke eligibility.

9. The contrast between this broad language and the interpretation the Department urges is striking—far from applying to violations of *"any"* provision" in the subchapter, section 1094, in the Department's view, should apply merely to violations of a very narrow class of program implementation rules:

A school could sell courses of sufficient length and be properly accredited, with eligible students enrolled, and yet: (1) fail to disburse aid checks properly; or (2) use federal funds for non-allowable purposes; or (3) make awards to ineligible students or to students attending ineligible campuses; or (4) miscalculate Pell Grant awards; or (5) fail to make correct refunds to lenders under the GSL program.

Brief of Appellants at 29–30. There is simply no basis in the language of the statute for viewing this narrow class of violations as exhaustively encompassing the class of violations of "any" provision of the subchapter specifically designated by section 1094(c)(1)(D).

the plain language of a statute.[10] It is well established that

considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer, and the principle of deference to administrative interpretations "has been consistently followed by this Court whenever decision as to the meaning or reach of a statute has involved reconciling conflicting policies, and a full understanding of the force of the statutory policy in the given situation has depended upon more than ordinary knowledge respecting the matters subjected to agency regulations."

*Chevron U.S.A. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844–45, 104 S.Ct. 2778, 2782–83, 81 L.Ed.2d 694 (1984) (quoting *United States v. Shimer*, 367 U.S. 374, 382, 81 S.Ct. 1554, 1560, 6 L.Ed.2d 908 (1961)). However, as Justice Stevens observed in *Chevron*, this deference is not owed where "Congress has directly spoken to the precise question at issue." *Id.* 467 U.S. at 842, 104 S.Ct. at 2781; *see* Pierce, Chevron *and its Aftermath: Judicial Review of Agency Interpretations of Statutory Provisions*, 41 Vand.L.Rev. 301, 301–02 (1988). Only where the statute is "silent or ambiguous" is there an issue of deference, for only in such cases may it be inferred that Congress has delegated a policy choice to the agency.[11]

In any event, only in cases of ambiguity must we further inquire whether the agency's interpretation is "based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843, 104 S.Ct. at 2782. In the case before us Congress has spoken quite directly to the issue, and the Department has been unable to find any textual support for any perceived ambiguity it might hope to discover in the language of the statute. The issue whether section 1094 encompasses violations of "any provision" of Subchapter IV, including fundamental eligibility provisions—as opposed to mere violations of "program administrative requirements"—is "a pure question of statutory construction for the courts to decide." *INS v. Cardoza–Fonseca*, 480 U.S. 421, 446, 107 S.Ct. 1207, 1221, 94 L.Ed.2d 434 (1987); *accord NLRB v. United Food & Commercial Workers Union*, 484 U.S. 112, 108 S.Ct. 413, 421, 98 L.Ed.2d 429 (1987); *Union of Concerned Scientists v. NRC*, 824 F.2d 108, 113 (D.C.Cir.1987). And even if the proper question is not whether a "pure" issue of statutory interpretation is involved, the issue before us is one which Congress has expressly addressed and which is capable of resolution on the basis

---

10. The Department asserts that the applicable regulations require this approach to the statute, an assertion that appears to be true. The Department certainly employed that interpretation in refusing Superior a hearing (and in the position it has taken before this court). We take up at a later point in the opinion the issue whether the regulations in fact apply in this case—and conclude that at least one of the regulations in which the Department's interpretation is officially set forth does not properly apply to the facts in this case. Thus, although the interpretation is one adopted in formal regulations, we do not here reach the regulation. There is, therefore, a possible argument that the *Chevron* question is not even raised here, *see Chevron, U.S.A. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), for we only review an interpretation of the statute (and regulation) that appears in an admittedly informal opinion by Assistant Secretary Whitehead. (It is concededly informal inasmuch as the Department has itself disclaimed any duty or intent to follow formal procedures in this case.) Informal agency interpretations may not generally be due deference under the *Chevron* standard. *See generally* Administrative Conference of the United States Recommendation 89–5, *Achieving Judicial Acceptance of Agency Statutory Interpretations* (adopted June 16, 1989). *But see Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 565, 100 S.Ct. 790, 796, 63 L.Ed.2d 22 (1980) ("Unless demonstrably irrational, Federal Reserve Board staff opinions construing the [Truth in Lending] Act or Regulation should be dispositive...."). However, because the same interpretation enunciated in the Whitehead opinion has also been adopted in formal Department regulations, we consider the applicability of the *Chevron* standard as if we reviewed formal rules or adjudications—despite the fact that the scope of our holding does not reach the key applicable regulation.

11. See R. Anthony, *Which Agency Interpretations Should Bind the Courts and the Public?*, Report to the Administrative Conference of the United States (Apr. 3, 1989) for an impressive exposition of the necessity for grounding the *Chevron* doctrine in congressional delegation.

of the statute's "plain language" alone. *Cf. Cardoza–Fonseca,* 480 U.S. at 452–53, 107 S.Ct. at 1224–25 ("if the language of a statute is clear, that language must be given effect," and inquiry into legislative history is unnecessary) (Scalia, J., concurring in judgment).[12] Under these circumstances, proponents of either "strong" or "weak" readings of *Chevron* would agree that we need not defer to the agency's construction[13]—and some would argue that no additional consideration of legislative history is called for.

### B.

However, because the Department advances an argument based upon legislative history, we move on to consider the issue. The Department's argument is highly inferential, based primarily not upon any express statements by framers of the statute indicating an intent to limit section 1094, but rather upon conclusions to be drawn from silence and inactivity. Thus, the Department finds illuminating the fact that it has repeatedly promulgated regulations indicating its interpretation, and that Congress has reviewed those regulations on a number of occasions pursuant to 20 U.S.C. section 1232. Even assuming that the regulations unequivocally indicate the interpretation that the Department urges in this court (i.e., that hearings under section 1094 shall be afforded only where violations of "program management" rules not pertinent to eligibility are at issue), section 1232 itself refutes the Department's view:

> Concurrently with the publication in the Federal Register of any final regulation ... such final regulation shall be transmitted to the Speaker of the House of Representatives and the President of the Senate. Such final regulation shall become effective not less than forty-five days after such transmission unless Congress shall, by concurrent resolution, find that the final regulation is inconsistent with the Act from which it derives authority, and disapprove such final regulation, in whole or in part. *Failure of the Congress to adopt such a concurrent resolution with respect to any such final regulation prescribed under any such Act, shall not represent, with respect to such final regulation, an approval or finding of consistency with the Act from which it derives its authority for any purpose, nor shall such failure to adopt a concurrent resolution be construed as evidence of an approval or findings of consistency to establish a prima facie case, or an inference or presumption, in any judicial proceeding.*

20 U.S.C. § 1232(d)(1) (emphasis added). We therefore decline to draw any conclusion from the congressional "review" of the Department's regulations under section 1232. We similarly decline to draw any conclusion from the fact that Congress has twice reenacted the HEA without amending section 1094, particularly when there is no indication that any controversy regarding section 1094 or the applicable regulations had been drawn to the attention of Congress before the time of those reenactments.[14] *See Aaron v. SEC,* 446 U.S. 680, 694 n. 11, 100 S.Ct. 1945, 1954 n. 11, 64 L.Ed.2d 611 (1980).

Finally, the Department argues that the original version of section 1094 (formerly section 1088f–1, added as part of the Edu-

---

**12.** We note that even under the deferential standard, we would be hard-pressed to find the agency's interpretation reasonable. However, such deference would not appear to be owing in this case.

**13.** *See* Sunstein, *Judicial Review of Administrative Action in a Conservative Era,* 39 Admin.L. Rev. 353, 366–71 (1987); Wald, *The Contribution of the D.C. Circuit to Administrative Law,* 40 Admin.L.Rev. 507, 508–30 (1988); *see also* Pierce, Chevron *and its Aftermath: Judicial Review of Agency Interpretations of Statutory Provisions,* 41 Vand.L.Rev. 301 (1988).

**14.** We note that the regulations, while they strongly suggest the interpretation the Department urges, do not clearly indicate the broad policy the Department now espouses. Further, the first case remotely on point that might have drawn attention to difficulties posed by the Department's interpretation of the statute, *Beth Rochel Seminary v. Bennett,* 825 F.2d 478 (D.C. Cir.1987), was decided in 1987, some time after the last reenactment by Congress in 1986.

cation Amendments of 1976) was enacted to provide the Secretary with "additional" remedies above and beyond the usual revocation procedures, for cases in which institutions were violating program administrative requirements. Brief of Appellants at 25–26.[15] As support for this proposition it cites two quite selectively edited portions of the legislative history. First, the Department contends, quoting from the Senate committee report, that

> this provision [section 1094(c)(1)(D)] was inserted because the Secretary's predecessor "ha[d] no statutory authority to withhold payments from a school that he knows is foundering and will not be able to provide its students their education, after its cost has been paid. It makes little sense to the Committee to require continued payment of Federal funds to an institution in financial crisis...."

Brief of Appellants at 25 (quoting S.Rep. No. 94–882, 94th Cong., 2d Sess. 33 (1976) [Senate Report]). The Department argues that this excerpt suggests a limited function for section 1094(c)(1)(D). (It is unclear why this language implies limiting the section's remedies to claimed violations of program administrative requirements; it

would seem rather to imply limiting the remedy to schools in financial crisis, an interpretation again completely without support in the plain language of the statute.) A fuller examination of the discussion preceding this quotation suggests a somewhat different interpretation:

> The Education Amendments of 1972 authorized the Commissioner to limit, suspend, or terminate institutional participation in the Guaranteed Student Loan Program, in a provision similar to that in the Committee bill.... The Committee bill would *extend* this protection to the Basic Grant, Work–Study, and Direct Student Loan Programs.

Senate Report at 33. Thus, section 1094(c)(1)(D) is not an entirely separate or new "additional" remedy applicable in limited circumstances, but rather an expansion of an existing revocation remedy to *all* of the programs in Subchapter IV. In any case, quotations from the Senate Report are of dubious value because, as we shall see below, it was the House version of section 1094(c)(1)(D) that was adopted.

The Department's second quotation from the legislative history proceeds as follows: "Tellingly, the Conference Report ... ex-

---

**15.** Curiously, the Department can point to no statutory provision delineating these "usual" procedures. Despite explicit statutory language in section 1094(c)(1)(D) providing for procedures to be followed when terminating "eligibility," the Department would have us conclude that the statute is *silent* as to procedures for the termination of "general" eligibility status—and that that silence should be read as a grant of complete discretion to the Department as to what procedures should be employed in revoking eligibility for any reason other than violation of program administrative rules. This is surely reading too much into the fact that the one explicit statutory provision dealing with revocation of eligibility is preceded by some language regarding the need to hold institutions to standards of fiscal responsibility. The statute nowhere distinguishes "general" eligibility revocations from eligibility revocations in response to violations of program administrative rules.

Further, even if a primary impetus for providing revocation procedures was a concern about wasting program money on fiscally irresponsible institutions (and there is some support for this in the language of the Senate report), this certainly does not preclude the conclusion that the procedures provided as a result of this concern were to be broadly applicable to revoca-

tions of eligibility for whatever reason. In any case, we must deal in the first instance with the statute as it was reported out of conference and enacted. And by that time there can be no question that the language of section 1094(c)(1)(D) provided broadly for the *only* eligibility revocation procedures delineated in the statute (in language that specifically includes revocation in response to violation of *any* program provision). In the absence of any clear message from either the legislative history or the plain language of the statute that the drafters intended to establish two entirely distinct revocation procedures, one explicitly delineated and the other never discussed, we cannot ignore clear statutory language (and, indeed, the most reliable indications from the legislative history) mandating notice and a hearing on the record prior to revocations of eligibility status.

In any case, the original emphasis on "fiscal responsibility" has been altered by subsequent amendments, indicating that if ever the emphasis of the provision was more on fiscal responsibility it has now been broadened rather than narrowed. *Compare* 20 U.S.C. § 1088f–1 [repealed] (providing for "fiscal audit of an eligible institution") *with* 20 U.S.C. § 1094(c)(1)(A)(i) (providing for "financial and compliance audit of an eligible institution").

plained that Congress created this provision so that the Secretary could act if an 'institution has violated regulations under *this section.'*" Brief of Appellants (quoting H.R.Conf.Rep. No. 94–1791, 94th Cong., 2d Sess. 201 (1976) [Conference Report]) (emphasis added). The Department seems to be implying here that section 1094(c)(1)(D) should be read as providing a remedy only for violations of the program administrative rules laid out in section 1094 itself.[16] (Even if the legislative history unambiguously indicated such a limited intent, we surely could not read an entirely different word from the legislative history into the plain language of the statute; the statute says "under this subchapter," not "under this section.") The full quotation, however, reveals that the portion quoted by the Department comes from the Senate bill, while it was the House version that the Conference adopted:

> The Senate bill expanded the Commissioner's authority (now in guaranteed loan program) only for limitation, suspension or termination of the eligibility of an institution to 3 programs—basic grants, work-study, and direct loans—if he has determined, after affording due notice and opportunity for a hearing, that such institution has violated regulations under this section. The House amendment gave the Commissioner the same limitation, suspension, and termination powers *for eligibility of institutions under all programs of this title;* provided that no suspension should exceed 60 days, unless the institution and the Commissioner agree to an extension or unless limitation or termination proceedings are initiated within that period of time. The Senate recedes with an amendment clarifying that the Commissioner must initiate such proceedings.

16. We note that section 1094 makes separate provision for hearings following audits designed to ensure compliance with program administrative and fiscal requirements. *See* 20 U.S.C. § 1094(b) ("An institution that has received written notice of a final audit or program review determination and that desires to have such determination reviewed by the Secretary shall submit to the secretary [sic] a written request for review.... The Secretary shall, upon receipt of written notice ... arrange for a

Conference Report at 201; *see* H.R.Rep. No. 94–1086, 94th Cong., 2d Sess. 73 (1976). Hence, to the extent this portion of the legislative history indicates anything, it indicates that the Conference intended the provisions of section 1094 to apply to violations of *any* program requirement delineated in Subchapter IV (precisely what the plain language of the statute indicates). It is quite clear, even from the legislative history, that the Conference did not intend limiting the revocation procedures delineated in section 1094(c)(1)(D) to review of violations of the program administrative requirements laid out in section 1094 itself.[17]

Because the Senate for the most part deferred to the House's view of section 1094(c)(1)(D), the legislative history in the House might have afforded the parties a more promising foundation for legislative intent arguments. When Representative O'Hara, Chairman of the Subcommittee on Post–Secondary Education (the subcommittee that authored the House version), introduced the bill eventually adopted by the House, he specifically discussed the language that is currently enacted as section 1094(c)(1)(D):

> The limitation, suspension, and termination language of this bill is taken from the existing language of section 438, which applies similar authority to the guaranteed loan program, but makes the authority applicable to all programs.... Mr. Chairman, the administration sought in its bill, a comprehensive combination of new authority to regulate eligibility and to regulate the accreditation process, as a means of controlling eligibility for these programs. The committee felt that this proposal ... deserved further hearings before being enacted. But there was on the statute books, section 438 ...

hearing on the record...."). The Department has evaded this statutory requirement by taking the apparently unusual step of refusing to finalize its audit.

17. This reading is bolstered by an additional comment that states that the "limitation, suspension, and termination" regulations must be modified "to make them applicable to all of Title IV of the Act." Conference Report at 201.

[and] the committee does feel that [existing section 438 regulations] make a good starting place for the implementation of this new provision of law. Surely, schools which have violated provisions of this title, or regulations properly promulgated under it, should not be permitted to continue to participate in the programs. Even if a student at such a school has to look to another institution for an education, it is hardly penalizing a student to steer him away from a school which is unable to live within the law.

122 Cong.Rec. 13496 (1976) (remarks of Rep. O'Hara); *see also id.* at 13499 (remarks of Rep. Quie) (expressing concern at protecting institutions' interests: "To the extent possible, let us assume most institutions act in good faith to follow the law and not assume each institution is guilty from the start."). Representative O'Hara's remarks could be read as support for an even broader application of section 1094(c)(1)(D) to include even initial eligibility determinations, for he views the provision as a starting point for a new comprehensive attempt "to regulate eligibility and to regulate the accreditation process, as a means of controlling eligibility for these programs." Of course, this broader approach does not accord any better with the "plain language" of the statute than does the narrower interpretation urged by the Department. Again, however, to the extent that any guideposts are available from the legislative history, they do not point in the direction urged by the Department (indeed, quite the opposite).[18]

### C.

We have concluded that the interpretation of section 1094(c)(1)(D) adhered to by the Department in this case, first when refusing Superior a hearing and then in arguments before this court and the district court, is unacceptable. We next face

the somewhat complex task of determining to what extent the interpretation advanced by the Department in this case is supported by the Department's own regulations. We further consider whether the regulations properly apply to Superior's case.

Of most obvious relevance is the regulation providing rules for imposing fines upon or terminating, suspending or limiting the eligibility of "otherwise eligible" institutions:

(a)(1) This subpart establishes rules for the imposition of a fine upon, or for the suspension, limitation or termination of an otherwise eligible institution's participation in any or all of the Title IV, HEA programs....

(b) This subpart [providing for hearing, if requested, prior to suspension, limitation or termination] applies to an institution which violates any Title IV, HEA program statute, regulation, special arrangement, agreement or limitation prescribed under authority of Title IV of the HEA;

(c) This subpart [providing for hearing, if requested, prior to suspension, limitation or termination] does not apply to a determination that—

(1) An institution of higher education fails at any time to meet the statutory definition set forth in section 435, 481 or 1201 of the HEA;

(2) A vocational school fails at any time to meet the statutory definition set forth in section 435(c) of the HEA....

34 C.F.R. § 668.81 (1988); *see also* 34 C.F.R. §§ 668.85 & 668.86 (1988) (providing for hearing upon request prior to suspension, limitation or termination). There is a very strong tension between subsections (b) and (c), for subsection (b) tracks the statutory language while subsection (c) essentially creates an exception to (b), with-

---

**18.** It is also interesting that in a more recent round of amendments to the HEA, on the somewhat analogous issue of hearings for revocation of eligibility for lenders, the House's policy of requiring procedural protection won the day: The House amendment, but not the Senate bill, provides that an eligible lender may only be disqualified as an eligible lender for the

use of certain incentives if the determination by the Secretary that such incentives have been offered is made after notice and opportunity for a hearing. The Senate recedes. H.R.Conf.Rep. No. 99-861, 99th Cong., 2d Sess. 403 (1986). This indicates a fairly strong concern for providing procedural protections where revocations of eligibility are concerned.

out any foundation in the statute. Subsection (b) requires hearings before revocation of the eligibility of an institution violating "any" Title IV program provision, statutory or regulatory. However, if the Title IV provision violated happens to be section 435 (now section 1085) or section 481 (now section 1088), then the word "any" from the statute suddenly ceases to apply. As we have indicated, there is no basis in the plain language (or the legislative history, if that were relevant) for creating such an exception, and this interpretation by the Secretary is untenable.

■ However, there is a problem not yet addressed by the Department or the district court; it is not clear that the regulation itself was properly applied to Superior in this case or that the regulation reaches as broadly as the Department has here urged. The regulation creates an exception where a school fails to meet the *statutory* definition laid out in the sections listed. The regulation does not create an exception where a school fails to meet the requirements of particular departmental regulations. In its ruling of February 1, 1989, the Department refers in cursory fashion to only two of the statutory provisions listed in the regulation: section 1085(c), delineating the fundamental eligibility criteria for vocational schools, and section 1088(b)(4), delineating eligibility criteria for "eligible proprietary institutions of higher learning." [19] Department of Education Eligibility Ruling (Feb. 1, 1989) at 2–6, *reprinted in* Appellant's App. at 82–86 [Ruling]. Neither of these statutory provisions set forth any particular clock hour requirements; those are contained in Department regulations. Thus, to the extent that the Department's decision regarding Superior was based upon Superior's failure to meet clock hour requirements, it was not based upon the kind of violation specifically exempted by 34 C.F.R. section 668.81 from the notice and hearing requirement of section 1094(c)(1)(D).

Specifically, in order to violate section 1085(c), Superior would have to fail to meet one of four requirements: (1) that it admit only persons who have completed or left elementary or secondary school and who could benefit from the training Superior offered; (2) that it be legally authorized to provide the training it offers preparing students for "useful employment in recognized occupations"; (3) that it have been in existence for 2 years prior to being granted eligibility; and (4) that it be accredited by a nationally-recognized accrediting agency or its equivalent. 20 U.S.C. § 1085(c). In its eligibility ruling, the Department also points to similar requirements of section 1088 as to accreditation, as well as to the requirement of section 1088(b)(1) that schools provide "not less than a 6–month program of training to prepare students for gainful employment in a recognized occupation." *See* Ruling at 3. There is no dispute as to whether Superior met the first three requirements of section 1085(c).

There is also no question that Superior's courses were accredited by the National Home Study Council. This is a key distinction between the case before us and the situation in *Beth Rochel Seminary v. Bennett*, 825 F.2d 478 (D.C.Cir.1987), in which, conversely, it was undisputed that the school had never been accredited by the applicable recognized accrediting body. *Id.* at 479–80. Thus, there was no doubt in *Beth Rochel* that the violation for which the Department was withdrawing eligibility was one that the Department's regulations exempted from the procedures of section 1094(c)(1)(D). The court in *Beth Rochel* focused exclusively upon construing the

---

19. We do not second-guess the Department on this issue since we review the basis for the decision as given. But we pause to note an oddity: the regulation appears to require a choice—either Superior does not qualify because it is "an institution of higher learning" ((c)(1)) that failed to meet the designated statutory criteria or because it is a "vocational school" ((c)(2)) that failed to meet the applicable statutory requirements. If it is a vocational school, then the only applicable statutory provision listed is section 435(c). The Department's ruling requires Superior to meet criteria for both kinds of institutions. This inconsistent approach does not find strong support in the language of either the Department's own regulations or the language of the statute. However, Superior does not contest this aspect of the Department's decision, and so we review it on its own terms.

Department's regulation and never considered whether the regulation was an acceptable rendition of the statute. *Id.* at 481–82. The court went on to hold that the Department could refuse to grant a hearing prior to withdrawing eligibility status, as long as eligibility was withdrawn on the basis of violation of one of the statutory definitional criteria set forth in the sections specified by the regulation. Our discussion should leave little question that we would, if required, take strong issue with the result reached in *Beth Rochel;* if 34 C.F.R. section 668.81(c) necessarily applied in the case before us, we would not hesitate to rule that the regulation is an unreasonable rendition of its enabling statute. However, it is unclear that we may reach that result on the facts of the present case. It is clear that the *interpretation* of the statute (and of the regulation) upon which the Department based its refusal to grant Superior a hearing is deficient. It is, however, unclear that the scope of our holding can reach the regulation, because it is unclear that the regulation is applicable to Superior's case.

There are only two criteria listed in the *statutory* provisions enumerated in 34 C.F.R. section 668.81(c) that were in any way involved in the Department's decision to withdraw Superior's eligibility. First, the Department indicated some doubt as to whether the Superior programs accredited by the National Home Study Council were the same programs described in Superior's application to the Department because there were discrepancies between the hour-length program descriptions submitted to the Council and those submitted to the Department. Assistant Secretary Whitehead's opinion, however, is somewhat tentative on this point, stating that *"if* STS accurately described these two programs in its February 26, 1980 eligibility application to ED, those programs were not the ones accredited by the National Home Study Council." Ruling at 19 (emphasis added). The Department's ruling goes on to state in the alternative that *"if* the programs *were* the programs accredited by the NHSC, they were less than the number of clock hours and weeks needed to satisfy the defi-

nition of a vocational school." *Id.* (emphasis added). The tentative nature of the Assistant Secretary's comments upon the accreditation issue is understandable; the courses accredited by the National Home Study Council had the same titles as those submitted to the Department—and it seems quite possible that Superior merely varied the clock hour descriptions of the "same" courses when representing them to the two different authorities. We do not deal here with revocation of accreditation by an accrediting agency or with failure to gain accreditation in the first instance. Thus, it seems dubious whether the Department's decision rested upon a violation of section 1085(c) or 1088(b)(4).

The second possible invocation of a statutory ground for revocation of Superior's eligibility found in the Assistant Secretary's opinion is a comment about the dubious character of Superior's compliance with the six-month requirement of section 1088(b)(1). The Assistant Secretary notes that a portion of the seven and one-half month time period GSL recipients generally expended upon Superior programs could be attributed to delays due to Superior's practice of mailing course material to students; he concludes that "[s]uch delays can not be included when determining whether a program is at least six months...." Ruling at 29. However, the Assistant Secretary does not explicitly rule that Superior failed to meet the six-month requirement, concluding rather that Superior "did not offer the 26 week, 401 clock hour truck driver program or the 26 week, 436 clock hour heavy equipment operators program described in its February 26, 1980 application." *Id.* at 30. This conclusion, like the bulk of the Department's ruling, rests on the complex clock hour calculations required not by statute but by regulation. Violations of those requirements are violations of regulations, not of the statutory requirements delineated in section 1085 or 1088 of the HEA. The Department could clearly have framed 34 C.F.R. section 668.81 to include violations of particular regulations (or, in more general language, of regulations generated pursuant to the listed

statutory provisions) had it wished such violations to be included.

The situation is admittedly somewhat unclear. Given the ambiguity, we will not strain to interpret either the Department's decision or the regulation in such a way as to require us to invalidate a Departmental regulation (although, as we have noted, we would have little difficulty in doing so, given our analysis of the statute, were it clear that our holding properly extended to reach that regulation). Thus, we somewhat reluctantly defer to another day the direct confrontation with the Departmental regulation faced by the Court of Appeals for the District of Columbia Circuit in *Beth Rochel*. For our purposes it suffices to invalidate the interpretation of section 1094(c)(1)(D) upon which the Department founded its denial of a hearing in this case.

The Department has also invoked a different regulation in this case, 34 C.F.R. section 600.32 (1988), which states that

(a) An institution loses its eligibility on the date that—

(1) It fails to meet any of the eligibility requirements of this part;

(2) It permanently closes; or

(3) It ceases to provide educational programs (except during normal vacation periods).

(b) If the Secretary designates an institution as an eligible institution on the basis of inaccurate information or documentation, the Secretary's designation is void from the date it was made and the institution never qualified as an eligible institution.

Once again we follow a conservative course, invalidating only the interpretation of this regulation that brings it into conflict with the statute. It would be possible, for example, to grant Superior a hearing before making the determination that it had failed to meet eligibility requirements—or that Superior had given the Department inaccurate information or documentation. If the Department then made its further calculations as to when eligibility ceased on the basis of 34 C.F.R. section 600.32, there would be no necessary conflict with the statute. But to the extent that 34 C.F.R. section 600.32 is interpreted to exclude the hearing on the record required by section 1094(c)(1)(D) prior to revocation of eligibility, it is in conflict with the statute and therefore invalid.

IV.

The district court also ruled in the alternative that the Department had deprived Superior of its constitutionally-guaranteed due process rights by failing to hold a full hearing on the record. We can agree with much of the district court's thoughtful analysis, but not with its conclusion on this issue.

■ The district court focused upon two kinds of injuries, following guidance from *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), in concluding that Superior had a liberty interest at stake. As discussed in *Roth*, the concept of constitutionally-protected liberty interests encompasses "the right of the individual to contract, to engage in any of the common occupations of life," *id.* at 572, 92 S.Ct. at 2706 (quoting *Meyer v. Nebraska*, 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042 (1923)), as well as a right to the "good name, reputation, honor, or integrity" essential to an individual's "standing and associations in his community." *Id.* 408 U.S. at 573, 92 S.Ct. at 2707 (quoting *Wisconsin v. Constantineau*, 400 U.S. 433, 437, 91 S.Ct. 507, 510, 27 L.Ed.2d 515 (1971)); *see also Hampton v. Mow Sun Wong*, 426 U.S. 88, 96 S.Ct. 1895, 48 L.Ed.2d 495 (1976). The first question focused upon by the district court was whether Superior would suffer financial detriment as a result of the Department's action. Given the financial stakes (Superior is heavily dependent upon federal funding), there can be little serious doubt on this score. The second question is whether Superior has suffered an injury to reputation as a result of the Department's actions. The publicity surrounding the Department's decision, as well as the ruling itself, contain allegations regarding Superior's conduct which could clearly damage Superior's reputation.

The district court also concluded that Superior had a property interest at stake. Here again we agree with much of the district court's approach. The Department attempts to argue that because Superior is an indirect beneficiary of student aid programs, it lacks a property interest in its eligibility status. As the Department now concedes, this court's precedent in *Northlake Community Hospital v. United States*, 654 F.2d 1234 (7th Cir.1981), does not support its argument. In *Northlake*, we held that a Medicare provider had a property interest in its provider agreement with the Department of Health and Human Services; however, we also concluded that the "private interest involved in the termination of a Medicare provider agreement is less weighty than the interest of a disability claimant." *Id.* at 1242. Where primary beneficiaries of federal programs depend upon providers like nursing homes, schools or banks for their benefits, and where the statutory program plan contains extensive discussion of certification or eligibility requirements and procedures for granting or revoking certification or eligibility, *cf. Cornelius v. LaCroix*, 838 F.2d 207 (7th Cir. 1988), it is difficult to conclude that there are no "rules or mutually explicit understandings" supporting the providers' claims of entitlement to certification or eligibility status. *Perry v. Sinderman*, 408 U.S. 593, 601, 92 S.Ct. 2694, 2699, 33 L.Ed.2d 570 (1972). The eligibility standards in the HEA provide the sort of "substantive predicate" the courts have required before finding that property interests exist. *See Bishop v. Wood*, 426 U.S. 341, 345–47, 96 S.Ct. 2074, 2077–79, 48 L.Ed.2d 684 (1976); *Board of Regents v. Roth*, 408 U.S. 564, 578, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972); *Cain v. Larson*, 879 F.2d 1424, 1426 n. 1 (7th Cir.1989); *Farmer v. Lane*, 864 F.2d 473, 478–80 (7th Cir.1988); *Fleury v. Clayton*, 847 F.2d 1229, 1232 (7th Cir. 1988).

We can therefore agree with the district court that Superior had both a liberty and a property interest at stake. We can further agree that Superior's interests were weighty as against the Department's interest in not providing a hearing. As in *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), the government has several interests at stake here. While one interest is unquestionably conservation of resources and administrative efficiency, the government also has an interest in ensuring that qualified programs do not have their eligibility cut off without due consideration—for the cutoff itself may close down the school and deprive students of the educational opportunity the HEA was designed to afford them. To paraphrase the Court in *Goldberg*, the same governmental interests that counseled the provisions of the HEA making loans available to students at eligible institutions counsel as well uninterrupted provision of services by properly eligible institutions. *Id.* at 265, 90 S.Ct. at 1019. (This is not to imply that the weight of this countervailing interest is as heavy as that invoked by the Court in *Goldberg*, where cessation of welfare funds could wreak the most profound imaginable hardships. There is a parallel, however, for as in *Goldberg*, the government in this case is charged with furthering two countervailing interests.)

Nevertheless, it is in the difference between this case and cases such as *Goldberg* and *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), that our difference with the district court lies. For although Superior has liberty and property interests that weigh heavily, and although the Department also has some interest in ensuring that potentially eligible institutions receive proper consideration before their funds are cut off, in this case Superior did receive quite a lot of predeprivation process. Superior's interest in receiving *some* predeprivation process may outweigh the Department's interest in not providing any, but this does not determine *how much* predeprivation process should be required. In *Goldberg* the issue was whether the New York Department of Social Services could cut off welfare aid without *any* predeprivation process. Although the Court required a predeprivation hearing in *Goldberg*, it went on to hold in *Mathews* that a predeprivation hearing prior to dis-

continuation of disability benefits was not constitutionally required. 424 U.S. at 349, 96 S.Ct. at 909. Indeed, no oral presentation of any kind was necessary; the Court held that existing provisions permitting predeprivation written submissions sufficed. *Id.* at 345–47, 96 S.Ct. at 907–09. We observed in *Northlake* that the weight of a provider's interest was not as heavy as that of a disability claimant.[20] If predeprivation written submissions suffice for disability claimants, then it is hard to argue that a provider of services, whose interest is less, should be entitled to more process. In this case Superior was permitted to make four written and two oral submissions to the Department, all of them *predeprivation*. This was constitutionally sufficient, even in light of the relative weight of Superior's interests.

### V.

Because the plaintiff received all the process constitutionally required, we reverse the district court's grant of summary judgment as to the due process claim. However, the Department must still comply with the requirements of the HEA before revoking Superior's eligibility status. Thus, until such time as the Department provides the requisite hearing, the permanent injunction granted by the district court shall stand. We pause to note that the grant of an initial hearing to Superior would have arguably entailed less effort than the patchwork procedure employed by the Department—and might well have saved the Department a lengthy and expensive foray into the federal courts.

Affirmed in Part, Reversed in Part.

---

**20.** Similarly, Superior's interest is not as weighty as that of its students—and even the interest of Superior's students arguably pales by comparison with the situation of the welfare recipient cut off from "the very means by which to live," 397 U.S. at 264, 90 S.Ct. at 1018, or the disabled person cut off from money for medical benefits.